# THE CITY OF BEARDSTOWN *et al.*

## *v.*

# THE CITY OF VIRGINIA *et al.*

1. ELECTIVE FRANCHISE—*alien minors residents of the State April* 1, 1848. The constitution of 1870 does not provide that all persons *who at any time* became electors by virtue of the constitution of 1848, shall be entitled to vote, or that every person who was or became an elector under that constitution, shall be so entitled. It only authorizes those persons to vote who were *electors* on the first day of April, 1848. Aliens who were minors on that day were not electors, and consequently are not made voters by the new constitution.

2. SAME—*naturalization in county court.* It was held in *Knox County* v. *Davis,* 63 Ill. 405, that the county courts of this State had no jurisdiction, under the act of Congress, to admit aliens to citizenship; but under the new constitution, certificates of naturalization granted by such courts prior to Jan. 1, 1870, entitled the parties receiving the same to vote, but not their minor sons after their becoming of age.

3. SAME—*presumption in favor of.* Where an alien born person votes at an election, the presumption that he is not entitled to vote arising from the fact of being alien born, is not sufficient to exclude his vote on

a contest, but the presumption will be that he voted legally. The presumption of law against the fact of the commission of crime, will overcome the one against his right to vote arising from the fact of his foreign birth.

4. SAME—*proof sufficient to overcome presumption of right to vote.* But where a person of foreign birth, who was a minor when he came to this country, testified that he had never been naturalized, and did not know that his father had been, it was *held,* that this afforded *prima facie* evidence that such person was not entitled to vote, notwithstanding he had voted.

5. CONSTRUCTION—*words taken in their ordinary meaning.* It is not allowable to interpret what has no need of interpretation, and where the words have a definite and precise meaning, to go elsewhere in search of conjecture in order to restrict or extend the meaning. Statutes and contracts should be read and understood according to the natural and most obvious import of the language, without resorting to subtle and forced construction, for the purpose of either limiting or extending their operation.

6. SAME—*of constitution and statutes.* In the construction of constitutional provisions and statutes, the question is not what was the intention of the framers, but what is the meaning of the words they have used. A constitution does not derive its force from the convention which framed it, but from the people who ratified it, and the intent to be arrived at is that of the people, and this is found only in the words of the text.

7. EVIDENCE—*proof of a negative.* Full and conclusive proof is not required where a party has the burden of establishing a negative, but even vague proof, or such as renders the existence of the negative probable, is in some cases sufficient to change the burden to the other party.

8. ELECTION—*accidental loss of ballots and affidavits of voters.* The fact of the loss of the ballots and affidavits made at an election in a particular precinct, where such loss is accidental, affords no ground for rejecting the entire return from such precinct.

9. EVIDENCE—*declarations of voter in contest.* On the contest of an election, the voter being considered a party as against the contestant, his declarations showing his want of qualification to vote may be shown against him, after first proving that he voted adversely to the contestant, on the ground that such declarations are against his interest. But where it is not shown by other competent evidence how he voted, such declarations are not admissible.

10. SAME—*declarations of voter not admissible to show how he voted.* On the contest of an election where the ballots are lost, the unsworn declarations of a voter as to how he voted, are not competent evidence to prove how he in fact voted.

11. SAME—*evidence to contradict ballot.* On the contest of an election, the ballot of a voter showed that he voted a certain way, but the voter testified that he voted the other way: *Held*, in the absence of proof of any fraud, that the testimony could not be received to show the intention of the voter in opposition to his ballot.

APPEAL from the Circuit Court of Cass county; the Hon. LYMAN LACEY, Judge, presiding.

This was a suit in chancery, brought by the city of Beardstown and others, against the city of Virginia and others, to contest an election held in the county of Cass, November 12, 1872, on the question of the removal of the county seat of the county from Beardstown to Virginia, and to restrain the county officers from removing their offices or the records of the county, until the final determination of the suit.

The facts necessary to an understanding of the points decided are stated in the opinion of the court.

Mr. ANTHONY THORNTON, Mr. GARLAND POLLARD, Mr. I. J. KETCHAM, Mr. THOMAS H. CARTER, and Messrs. HAY, GREENE & LITTLER, for the appellants.

Messrs. LAWRENCE, WINSTON, CAMPBELL & LAWRENCE, Mr. C. G. WHITNEY, Mr. J. N. GRIDLEY, and Mr. ISAAC L. MORRISON, for the appellees.

Mr. JUSTICE SHELDON delivered the opinion of the Court:

On the 12th day of November, 1872, an election was held in the county of Cass, to determine whether the county seat should be removed from Beardstown to Virginia, the latter being nearer the centre of the county than the former. By the returns of the board of canvassers, the election was decided in favor of removal, by a majority of 128 votes.

To contest this decision, a bill in chancery was filed by Beardstown against Virginia, and the county officers were made parties, and enjoined from removing their records from

the court house at Beardstown, and from transacting any official business in the town of Virginia, pending the suit.

After the cause was at issue, the evidence was taken in vacation by a commission, and finally heard by the court below, at the August term, 1874, the result of whose finding was as follows:

| | |
|---|---:|
| Majority for removal, by election returns.............. | 128 |
| Votes against removal, which were rejected by the court as illegal, on the hearing......................... | 129 |
| Votes illegally excluded by the judges of election, and received by the court............................ | 2 |
| Total ... ....... ........................... | 259 |
| Votes for removal, which were rejected by the court as illegal, on the hearing........................ | 102 |
| Legal voters of Cass county, upon the day of election, who did not vote................................. | 149 |
| Total.... .... .............................. | 251 |
| Leaving majority for removal....................... | 8 |

In pursuance of this finding of the court, a decree was rendered dissolving the injunction and dismissing the bill. This appeal is prosecuted to reverse the decision of the court below, and cross-errors are assigned by defendants.

Several legal questions arose upon the evidence which appellants insist were erroneously determined against them.

One is, are persons of foreign birth, who have never been naturalized, but who were, on the first day of April, 1848, *minors*, and inhabitants of the State of Illinois, legal voters under the constitution of 1870?

Of this class, 44 voted—10 for and 34 against removal. The court below refused to count these votes.

The suffrage clause of the constitution of 1870 is as follows:

'' Every person having resided in this State one year, in the county ninety days, and in the election district thirty

days next preceding any election therein, who was an elector in this State on the first day of April, in the year of our Lord 1848, or obtained a certificate of naturalization before any court of record in this State, prior to the 1st day of January, in the year of our Lord 1870, or who shall be a male citizen of the United States, above the age of 21 years, shall be entitled to vote at such election." Rev. Stat. 1874, p. 73, sec. 1, art. 7.. The right of these persons to vote is based upon the ground that they were electors in the State of Illinois on the first day of April, 1848. Whether they were or not must be determined by reference to the constitution of 1848.

Sec. 1, art. 6, of that constitution, is as follows:

"In all elections, every white male citizen above the age of 21 years, having resided in the State one year next preceding any election, shall be entitled to vote at such election; and every white male inhabitant of the age aforesaid, who may be a resident of the State at the time of the adoption of this constitution, shall have the right of voting as aforesaid; but no such citizen or inhabitant shall be entitled to vote except in the district or county in which he shall actually reside at the time of such election." Rev. Stat. 1874, p. 51. That constitution was adopted in convention August 31, 1847, ratified by the people March 6, 1848, and became in force April 1, 1848, and by it persons having the following qualifications were "electors on the 1st day of April, 1848:"

1.   White male CITIZENS, above the age of 21 years, having resided in the State one year next preceding any election.

2.   White male INHABITANTS, *of the age of* 21 *years*, residents of the State at the time of the adoption of the constitution, *i. e.* March 6, 1848.

These 44 persons were not electors under the first clause, as they were never citizens. It is claimed, however, that they became electors under the second clause; that under this clause they were entitled to vote as soon as they became of age, by reason of the fact that they were white male inhabitants, and

residents of the State on the 6th day of March, 1848, the day of the adoption of the constitution of 1848. Without considering whether this is the true construction of the second clause of sec. 1, but upon the hypothesis that it is, and that these persons did become voters, by virtue of the constitution of 1848, *when they became of age,* we are of opinion that they are not shown to be electors under the constitution of 1870.

That instrument does not provide that all persons *who at any time* became electors by virtue of the constitution of 1848, should be entitled to vote, or that every person who was or became an elector under that constitution should be so entitled. It only authorizes those persons to vote who were electors on a specified day, to-wit: the first day of April, 1848. But on that day these persons were *minors,* and therefore, *were not electors.*

The definition given by Webster, in his dictionary, of "elector," is, "One who elects, or one who has the right of choice; a person who has, by law or constitution, the right of voting for an officer."

" Elector—one who has the right to make choice of public officers; one who has a right to vote." Bouvier Law Dict. letter E.

Not one of these persons had the right to vote on the first day of April, 1848, and so they were not electors on that day.

It is, however, urged that the constitution of 1870 could not have intended to disfranchise those who, though not electors on the 1st day of April, 1848, by reason of their minority on that day, afterwards became voters by virtue of the constitution of 1848, and had exercised the elective franchise ever since; and that it must have intended to include all persons who at any time became voters under the constitution of 1848; and it is insisted that by an equitable construction such should be held to be the meaning of the words " electors on the 1st day of April, 1848." That the restricting of the elective franchise to the alien born unnaturalized inhabitants, who were residents of the State on the 1st day of April,

1848, to those who were 21 years of age, and to deprive the alien born minors who were inhabitants at that same time of that privilege, would be an odious and unjust discrimination, and there would be no good reason for it.

But the words of the constitution of 1870 are clear and explicit on this point; there is no ambiguity in the language, and no room for construction.

" Where a law is plain and unambiguous, whether it be expressed in general or limited terms, the legislature should be intended to mean what they have plainly expressed, and consequently no room is left for construction. Possible or even probable meanings, when one is plainly declared in the instrument itself, the courts are not at liberty to search for elsewhere." Cooley's Const. Lim. 55, and see cases cited and note.

It is not allowable to interpret what has no need of interpretation, and when the words have a definite and precise meaning, to go elsewhere in search of conjecture in order to restrict or extend the meaning. Statutes and contracts should be read and understood according to the natural and most obvious import of the language, without resorting to subtle and forced construction for the purpose of either limiting or extending their operation. *McCluskey* v. *Cromwell,* 11 N. Y. 601. The rule is well expressed by JOHNSON, J., in *Newell* v. *The People,* 3 Seld. 97, in these words : " Whether we are considering an agreement between parties, a statute or a constitution, with a view to its interpretation, the thing we are to seek is, the thought which it expresses. To ascertain this, the first resort in all cases is to the natural signification of the words employed, in the order and grammatical arrangement in which the framers of the instrument have placed them. If, thus regarded, the words embody a definite meaning, which involves no absurdity and no contradiction between different parts of the same writing, then that meaning apparent upon the face of the instrument, is the one which alone we are at liberty to say was intended to be conveyed. In such a case there is no room for construction. That which the

words declare, is the meaning of the instrument; and neither courts nor legislatures have the right to add to, or take away from that meaning."

The question in this and other cases of construction of written instruments is, not what was the intention of the parties, but what is the meaning of the words they have used. Per DENMAN, Ch. J., in *Rickman* v. *Carstairs*, 5 B. and A. 129.

It was said by BRONSON, J., in *Waller* v. *Harris*, 20 Wend. 561, that "the current of authority at the present day is in favor of reading statutes according to the natural and most obvious import of the language, without resorting to subtle and forced constructions for the purpose of either limiting or extending their operation." And see *The People* v. *Purdy*, 2 Hill, 35, and 4 Hill, 384; *Denn* v. *Reid*, 10 Pet. 524; *Spragins* v. *Houghton*, 2 Scam. 377. These doctrines received the explicit recognition and approval of this court in *Hills* v. *City of Chicago*, 50 Ill. 86.

In view of the well settled and sound and only safe principles applicable to the exposition of constitutions, statutes, and instruments in writing above declared, we do not feel at liberty to enter into the field of speculation, and essay whether we may not construe away the plain and obvious meaning of the clearly expressed language in question, according to some conjectural intention of the framers of the constitution.

The constitution does not derive its force from the convention which framed, but from the people who ratified it, and the intent to be arrived at, is that of the people. Cooley Const. Lim. 66.

Says Judge Story, in speaking of the constitution of the United States, " The people adopted the constitution according to the words of the text in their reasonable interpretation, and not according to the private interpretation of any particular men." 1 Story Com. on Con. 392, note.

The injustice of a constitutional provision does not authorize the courts to disregard it, or indirectly to annul it by construing it away.

Such provisions, when free from doubt, must receive the same construction as any others.  Cooley Const. Lim. 73.

There are no such monstrous and absurd consequences involved as to require a departure from the natural and obvious meaning of the words here employed.  Allowing the correctness of appellants' construction that, under the constitution of 1848, alien born persons who were minors on April 1, 1848, became voters on their afterwards attaining majority, the extent of the injustice done, or hardship imposed upon such persons by the constitution of 1870 would be, the subjecting them to the inconvenience of applying to be naturalized, as they were entitled to be naturalized at once, upon their mere application, without any previous declaration of intention.  Where citizenship is thus easily obtainable, is it an unreasonable hardship to require it as a prerequisite to the right of voting?  It is a just policy, in such case, to induce one to become a citizen, and be subject to the obligations of a citizen.  It is an unfair distinction against the citizen, in such case, that a class of persons should enjoy the highest privilege of the citizen, the elective franchise, and be exempt from the burdens of the citizen.

Reference is made by appellants to the use of the words "qualified electors," in the 8th section of the schedule of the constitution of 1870, and in the 11th section of the schedule of the constitution of 1848, as indicating a distinction made by the constitution between "electors" and "qualified electors."  The words in the schedule of the constitution of 1870 are used in this connection:  "Every person entitled to vote under the provisions of this constitution, as defined in the article in relation to 'suffrage,' shall be entitled to vote for the adoption or rejection of this constitution, and for or against the articles, sections, and questions aforesaid, separately submitted; and the said qualified electors shall vote at the usual places of voting," etc.  And the words are used in the same connection in the schedule of the constitution of 1848.  Now, plainly, the words "qualified electors," are

not here used, in any way, in contradistinction from "electors," but merely as expressive of the class of persons who might vote at the approaching election upon the question of the adoption of the constitution. "The said qualified electors shall vote," etc., that is, the persons having the said qualifications of voters as named in the preceding clause. The persons who, on the first day of April, 1848, were electors, were qualified electors; and *vice versa*; there is no distinction between them, and the constitution does not sanction the idea of a distinction.

The court below refused to count, in favor of appellants, ten voters who were minors when their fathers, on proceedings in the county court, had obtained naturalization papers.

The constitution of 1870 provides, that every person shall be entitled to vote who had obtained a certificate of naturalization before any court of record in this State, prior to the first day of January, 1870. The county court, although a court of record, was held, in *Knox County* v. *Davis*, 63 Ill. 405, not to have jurisdiction under the act of Congress to admit to citizenship. Consequently, the obtaining these certificates of naturalization did not make the fathers, or the minor sons, citizens. The certificates entitled the fathers themselves, under the constitution of 1870, to vote; but not their minor sons. And here, again, we are urged to disregard the law as written, and declare that these minors had the right to vote, because such was the intention of the framers of the constitution. The intent must be found in the instrument itself. Effect can not be given to an intention not expressed. The question is, not what the framers of the constitution meant as distinguished from what its words express, but simply what is the meaning of the words. It is clear that the language of the constitution describing the fathers only as entitled to vote by virtue of these certificates of naturalization, does not give the right to the sons.

The court rejected sixteen votes against removal, and six for removal, making the difference of ten against appellants,

upon the following state of facts: The proof was, that the persons giving the votes were alien born, and that they came to the State with their fathers during minority. They stated, in their evidence as witnesses, that they had never, and they did not know that their fathers had, been naturalized, and they were inhabitants of the State, during their minority, long enough for their fathers to be naturalized. In some instances the fathers had voted. Upon these facts, the court ruled that the presumption in favor of the vote had been overcome.

As the negative allegation here involved a charge of crime —one voting without qualification, at such an election, being liable to punishment in the penitentiary—it was necessary to prove that those giving the votes in question, were not legal voters.

The presumption that they were not, arising from the fact of being alien born, we think was not sufficient, but that they having voted, the presumption would be that they had voted legally, and not committed a crime; and this presumption of law against crime would overcome the former, and it would be necessary to rebut such counter and stronger presumption by some positive evidence to establish the negative. Full and conclusive proof, however, where a party has the burden of proving a negative, is not required, but even vague proof, or such as renders the existence of the negative probable, is, in some cases, sufficient to change the burden to the other party. *The People* v. *Pease,* 27 N. Y. 45; *Commonwealth* v. *Bredford,* 9 Metc. 268; 1 Greenlf. Ev. sec. 80.

We are of opinion that the statement here in evidence of these persons that they had never been naturalized, and that they did not know that their fathers had been, constituted *prima facie* evidence that such persons had not been naturalized and so entitled to vote, and that the court was warranted in so inferring from such evidence. Had their fathers been naturalized whilst they were minors, it is probable they would have known of the fact.

It is insisted that the court erred in not rejecting the returns from Lancaster precinct, which showed quite a majority in favor of removal. The statute requires that, at the close of the polls, the board of election shall canvass the votes, and shall make two tally lists, one of which, with one of the poll-books, and the ballots properly strung, and the affidavits made at the election, shall be sealed up together and delivered to the county clerk. Rev. Stat. 1874, p. 318, sec. 83.

Another section requires the county clerk to summon two justices of the peace, who, with the clerk, shall open and canvass the votes and returns of the election. Ib. sec. 86. When the canvassing board, composed of the county clerk and two justices of the peace, met to perform its duty, they had none of the ballots or affidavits used at the election in Lancaster precinct; they had been lost or destroyed. The judge of the election, who took the returns to the county clerk, testified that he delivered to the county clerk the ballots and affidavits used at the election in Lancaster precinct. The clerk testified that he had no recollection of having seen them. The claim for the rejection of the returns of this precinct is founded upon the missing of said ballots alone, without any evidence, more than the above, for the imputation of wrongdoing to any one whatever. The circumstance of the want of the ballots has doubtless operated prejudicially to appellants, but, for aught that appears, it is through accident, or at least without the fault of appellees or any voter of Lancaster precinct. It can not form ground for the exclusion of the whole vote of the precinct. Such exclusion would be a manifest injustice to appellees and to the voters of the precinct.

The poll-books show that six persons voted in Lancaster precinct, whose votes appellants sought to have rejected. The ballots being wanting to show how these persons voted, appellants offered proof of their declarations, made after the election, that they voted for removal, and that they were disqualified. The court below held that such declarations were

competent to prove the disqualifications of the voters, but not to prove how they voted ; and there being no evidence how they voted other than their own declarations, the six votes were counted.

It is the established practice of legislative bodies, upon inquiries as to the election of members thereof, to receive in evidence the declarations of voters as to their disqualifications.    The case of *The People* v. *Pease* is one which gives some judicial sanction to such a practice in courts of justice. The decision there was by a divided court, the main controversy in the case being, whether the decision of the inspectors of elections, in receiving the ballots of voters, was conclusive, or whether it was competent for the court to go behind the ballot-box and inquire into the qualifications of the voters. . The opinions on the part of the majority of the court were delivered by Justices Davies and Selden.    The former, in the course of his opinion, says: "In the case at bar, the disqualification was proven by the voter himself; but these authorities (referring to parliamentary election cases, and the note to 3 McCord Rep. 230, and 2 Cow. & Hill's Notes, 322) abundantly sustain the position that the declaration of the voter, as to his want of qualification, would have been admissible and legal evidence."    The only declarations of the voters in that case, were those made by themselves while on the stand and under oath, so that the opinion in this respect, of the declarations out of court, of voters, appears to be upon a point not before the court.    In the opinion of Mr. Justice Selden, there is nothing in support of this language on the subject of hearsay evidence.

The authority of this case, as regards the main point which was in controversy in it, was repudiated by the Supreme Court of Michigan in *The People* v. *Cicott*, 16 Mich. 296 ; and, so far as the decision slightly goes in that direction, would rather seem to be adverse as to receiving declarations of voters.

*State* v. *Olin*, 23 Wis. 311, sustains the rule as contended for by appellants, that the declarations of voters are receivable

in evidence, both of their want of qualification and of how they voted. It is to be observed, in reference to this case, that the voters were placed upon the stand, and there refused to testify, upon the ground that their evidence might tend to criminate themselves. On the contrary, the doctrine is expressly repudiated in the case of *Gilliland* v. *Schuyler,* 9 Kan. 569.

This practice with legislative bodies of receiving in evidence the declarations of voters, has, at best, not as yet received more than a limited judicial sanction in courts of justice. It is, apparently, contrary to legal principle, as being the reception of hearsay evidence. The ground of the admission of such testimony seems to be that stated by Mr. Thesiger, (afterwards Lord Chancellor,) in a case before the election committee of the House of Commons in England : "A voter who has voted for the sitting member, is always considered as a party, and it is on that ground that his declarations are admissible. The question is always considered to be between the voter and the party questioning his vote, and not merely between the sitting member and the petitioner." Fale & Fitzh. Election Cases, p. 72. Considering the voter as a party, then it consists with legal principle to receive in evidence his declarations against himself, under the rule that the declarations of a party to the record are, as against such party, admissible in evidence. But this is on the ground of their being declarations against the interest of the party, and therefore probably true. But the declarations of a party are never receivable *for,* but only *against* him. The difficulty in the reception of these declarations here, is, it does not appear by any legal evidence that they were *against;* they may have been *in favor* of the parties who made them. The poll-books show that these persons voted ; that is all. The ballots of Lancaster precinct being lost, there is no evidence whatever *how* these persons voted, except their own declarations afterward, offered in evidence. They were not, themselves, placed upon the stand ; no effort was made to get their testimony,

and no reason shown why it could not be got; but third persons are placed upon the stand who testify that these absent voters, after the election had passed, admitted that they were not legal voters, and that they had voted "for removal."

We think there should be some legal evidence that they voted "for removal," before their declarations, not under oath, are admissible in evidence. May be they voted "against removal." If they did so, then, admitting these declarations —the voters being considered as parties—would be receiving in evidence the declarations of a party in his own favor. Could they, by their unsworn statements of their disqualification, and that they voted for removal, cause six votes "for removal" to be stricken out, then they would, in effect, double their vote "against removal."

The reception of such statements, as evidence *how* these voters cast their votes, would, in our view, under the circumstances of this case, be inconsistent with legal principle, and dangerous in tendency in opening a door to fraud.

There being, then, no evidence as to how these six voters in Lancaster precinct voted, other than their own declarations afterward, made without the sanction of an oath, we are of opinion the court below did right in not rejecting their votes, notwithstanding their declarations of disqualification as voters, and that they voted "for removal."

Three persons were counted for removal, and the ballots disclosed that they so voted ; each one, however, testified that he voted against removal. Nothing more than that is disclosed or claimed, of any fraud or mistake. Appellants insist that the will of the electors should be carried out, and the so-called mistake be corrected.

We know of no precedent or principle for such a proceeding. The intention of the elector can not be thus inquired into when it is opposed to the paper ballot which he has deposited in the ballot-box. That is to prevail as the highest evidence of his intention. *The People* v. *Seaman,* 5 Denio,

409; *The People* v. *Saxton*; 22 N. Y. 309.   Were there independent proof of fraud, a different question would be presented.

In the rulings of the court below against appellants, in respect of matters of law, we find no error.

As regards matters of fact, a great number of findings in respect thereto, on both sides, in the admission and rejection of individual votes, as well as in passing upon the legal qualifications as voters, of such in the county who did not vote, all of whom, under the statute, are to be counted against removal, are complained of as being erroneous.

To review the cases in detail would be tedious, and serve no useful end, and we shall undertake no more than to state the conclusion.   We find a number of cases on each side where we would be inclined to find differently from the court below in the admission and rejection of individual votes; but, upon a balancing thereof, the one against the other, on the respective sides, we fail to find an excess of erroneous rulings against appellants large enough to overcome the majority of votes in favor of removal, found by the decree.

Upon consideration of the whole case, we are satisfied the election was fairly carried by a majority of all the legal voters of the county, and perceive no sufficient reason to disturb the decree.   It will therefore be affirmed.

*Decree affirmed.*

Mr. CHIEF JUSTICE WALKER:   I hold that those who were of foreign birth and minors, at the adoption of the constitution of 1848, never became voters under that instrument.