WILLIAM BEALL

*v.*

MARTIN ALBERT.

*Filed at Springfield November 25, 1895.*

</div>

1. ELECTIONS—*ballots properly preserved are best evidence of result.*  In
a contested election proceeding the ballots are better evidence of
the vote than the count made by the judges of election, where such
ballots have been preserved according to law.

2. SAME—*want of care of ballots destroys their force as evidence.*   The
count by the judges should prevail over the ballots, in an election
contest, where the ballots were placed in the unlocked desk of the
village clerk, who left the State without placing them in charge
of any one, and they remained there for some time without care,
and the envelope containing them had the flap partially torn off,—
especially where there is evidence that some of the ballots have
been altered.

APPEAL from the County Court of Macon county; the
Hon. WILLIAM E. NELSON, Judge, presiding.

This was a proceeding in the county court of Macon
county to contest the election of appellant to the office
of president of the board of trustees of the village of
Warrensburg, in the county of Macon.   Appellee, Albert,
who was the then incumbent of said office, and appellant,

Beall, were rival candidates at the village election held on the 17th of April, 1894. At the close of the polls it was found by the judges of the election that there had been cast 105 ballots, and Albert had received 49 and Beall 54 votes, and two failed to designate a choice for either. The result so found was then publicly announced. The ballots were folded and strung on a wire, and the ends of the wire were brought together and sealed with wax, upon which the village seal was impressed. The ballots so folded and strung were placed in an envelope, such as is ordinarily used for that purpose, the envelope was sealed up, and the seal of the village, impressed on wax, placed on the center of the flap of the envelope. Minson, the village clerk, who was also one of the clerks of the election, then filled up the blanks on the envelope, and wrote his name and address upon the face of the envelope with pen and ink. He then took charge of the package as village clerk, and put it, as is supposed, in the desk belonging to the village, kept in a small room used as an office and opening into a meat shop kept by J. H. Burnham. At any rate the package was afterward found in this desk, Minson having left the village five days after the election and removed to the State of Iowa. His term did not expire till May 4, but he did not resign, nor did he turn over the village election records to any one or make any provision for their safe keeping. The desk was not locked, and it was easily accessible to any one who might feel disposed to examine or tamper with the village papers and records kept there. In this desk were also kept the village seal, sealing wax, and other envelopes similar to the one enclosing the ballots.

On April 20 the board of trustees met and canvassed the returns as made by the judges of election, and declared that Beall was elected president and M. L. Purdon village clerk. Beall and Purdon afterwards qualified, as provided by law. On May 1, Albert, then president of the board, appointed John Williams village clerk in place

of Minson, who had removed from the State on April 22,
and took him to the office where the desk was kept, and
directed him to put a lock on the desk, lock it up, and
take care of the key until Purdon should enter upon his
duties as clerk.   Williams' appointment had not been
confirmed by the trustees, and he had not given bond or
taken the oath of office.   He testified that the seal was
not broken or the ballots tampered with while they were
in his possession, nor until he delivered them to Purdon
when he entered upon the duties of the office, except
that the envelope was opened and the ballots counted by
the village board on May 3, as stated below.  Albert tes-
tified that before the clerk, Minson, left, and a few days
after the election, he told Albert that he believed that
Albert was elected president and one Walter Majors was
elected police magistrate, and that thereupon he, Albert,
asked Majors to join with him in contesting the election,
promising Majors that it should cost him nothing.  Albert
caused a petition to be drawn, which was signed by him
and Majors, and presented to the board of trustees, on
the supposition that it was a matter for the board to
decide.   Majors testified that on the evening of April 22
Albert came to him and told him that he, Majors, was
elected police magistrate, and a recount would show that
he was elected by five majority, and when he, Majors,
expressed disbelief, Albert offered to bet him five dollars
to one that he was elected by five majority; that Albert
claimed also that he had been elected president of the
board; that Albert asked him if he would contest the
election if he knew he was elected, and he replied that
he would if he was positive about it and if it would not
cost him anything; that Albert promised him that it
should not cost him anything, and soon after brought
him papers which he signed; that on the recount by the
board it was found that he had been elected magistrate
by seven majority, but he declined to serve.

In pursuance of the petition a special meeting of the board of trustees was called by Albert, and held on the evening of May 3, at which Albert presided as president. A large number of persons were present, and the board having decided to recount the ballots, the package was exhibited to one or more of the judges of election who were present, and others, who expressed satisfaction that the envelope had not been opened since it was sealed up by the judges, though it does not appear that they examined it minutely. The president appointed four persons to make the recount. The envelope was opened in such a manner as not to interfere with the seal put there when the ballots were first counted at the close of the polls, and on the recount it was found that, as the ballots then showed, Albert had received 53 votes and Beall 50 votes. The ballots were then re-strung on the wire, replaced in the envelope and sealed up, and there is no question that they then remained in the same condition until produced, opened and examined in the county court on the hearing of this cause. Beall was present at the recount by the board of trustees and made no objection, but took no part in the proceedings, except, as claimed by Albert and another, to suggest the appointment of one Tucker as one of the persons to make the recount. Tucker was appointed, but Beall denies that he suggested or requested it.

Being further advised, Albert presented his petition contesting the election of Beall to the county court, where the foregoing facts appeared in evidence. Beall objected to the opening of the envelope and to a recount of the ballots in the county court, on the ground that they had not been properly preserved and were no longer the best evidence of the result of the election, but the court overruled the objection, and the envelope was again opened in such a manner as not to interfere with or mar the seals previously affixed. On the recount in the county court the same result was found as on the first recount by the board of trustees. Evidence was then taken on the ques-

tion as to whether or not the ballots had been changed since they were counted by the judges of election at the close of the polls, and all three of said judges testified that as to four of the ballots, where a cross was made in the circle at the head of the ticket, containing the name of Beall, indicating the intention of the voter to vote for all the candidates on that ticket, another cross appeared in the square opposite the name of Albert on the other ticket containing his name, which made the ballot a vote for Albert instead of Beall, and that such cross was not in the square opposite the name of Albert when they counted the votes at the close of the polls. On cross-examination they all admitted they might be mistaken, and two of them testified that they did not carefully examine the face of all the ballots, but that one of them unfolded them and handed them to another. Nieman, who examined them, called them off to the clerks who kept the tally, and then passed them to the other judge, who folded and strung them on the wire. Some evidence was given tending to show that part of the envelope had been torn since it was sealed by the judges of election. The several persons in charge of and accustomed to be about the office and meat shop where the ballots had been kept in the unlocked desk, testified that they had not, and did not know that any one else had, tampered with the ballots or envelope in which the ballots were enclosed. But Minson, who was one of the clerks of the election and was the retiring village clerk, and who took charge of the ballots and left them in the desk, was not produced as a witness nor was his deposition taken. The county court found that Albert had received 53 votes and Beall but 50, and that Albert had been duly elected. Beall took this appeal to reverse the order and decree rendered by the court.

MILLS BROS., and J. M. GRAY, for appellant.

W. C. JOHNS, and D. HUTCHINSON, for appellee.

Mr. JUSTICE CARTER delivered the opinion of the court:

Appellant insists that the order and decree of the county court finding that appellee had received the greater number of votes, and was therefore elected president of the board of trustees of the village of Warrensburg, must be reversed, for the reason that the ballots had not been carefully preserved, as required by law, but, on the contrary, had been left exposed to unauthorized handling by designing persons, and because the evidence showed that the ballots had in fact been tampered with and some of them changed since they were counted by the judges of election. By the count of the judges of election and the canvass of the returns by the board of trustees appellant was declared elected, and he thereupon qualified and was duly installed in office. By an unauthorized recount of the ballots by the village board while appellee was president, and later by the recount in the contest in the county court, it was found that appellee had a majority of three, and the question is, had the ballots lost their controlling character as the best evidence of the result of the election.

The rule is, that in a contested election proceeding the ballots are better evidence of the number of votes received by the respective candidates than the count made by the judges of election, where such ballots have been preserved according to law, and have not been so exposed to the reach of unauthorized persons as to afford a reasonable probability of their having been changed or tampered with. (*Hudson* v. *Solomon*, 19 Kan. 177; *Kingery* v. *Berry*, 94 Ill. 515; *People* v. *Burden*, 45 Cal. 241; Cooley's Const. Lim. (6th ed.) 788; McCrary on Elections, (2d ed.) secs. 555, 277; *Murphy* v. *Battle*, 155 Ill. 182.) In the case at bar the evidence showed that the ballots had not been carefully preserved, but had been exposed to such risks of unauthorized handling, manipulation and change as to discredit them as the best evidence of the result of

the election in question. The village clerk, Minson, who received from the judges of election the sealed envelope containing the ballots, and whose official duty it was to carefully preserve them for the length of time prescribed by the statute, placed the envelope containing the ballots in an unlocked desk, where he also kept the village seal, sealing wax and other similar envelopes belonging to the village. This desk was in a small office kept by one Burnham, opening into his meat shop, and was a place frequented by the public. Minson left the village five days after the election and removed to the State of Iowa to reside permanently. He did not resign his office as clerk and deliver the ballots and the village records and property in his hands to his successor, nor did he in any manner provide for their safe keeping, but left them to such care and safety as chance might provide. It does not appear when he placed the ballots in this desk, nor how long they had been there before the first day of May, when Williams, who was then appointed by appellee to fill the vacancy, took charge of them, so that from the time the ballots were delivered to the clerk, Minson, on the seventeenth day of April, until the first day of May, no light is thrown on the manner in which they were kept, except that they were found in the desk above mentioned. Before leaving the village, however, Minson informed appellee that he believed that he was elected over appellant. Upon what information this belief was founded does not appear. He was one of the clerks of the election and helped to keep the tally when the ballots were counted, but it does not appear that he suggested at that time that there was any mistake in the count. After receiving this information, appellee, according to the testimony of Majors, who by the count had been defeated as a candidate for police magistrate, went to Majors and offered to bet five dollars to one that he, Majors, was elected by a majority of five votes, and stated that he, Albert, was also elected, and agreed to

pay the costs if Majors would join him in the contest. Appellee was then president of the board of trustees. He seems to have known where the ballots were and that they were not being properly kept, for, eight days after Minson left, he took Williams to the office where they were, and directed him to put a lock on the desk, lock them up and take charge of the key. These facts do not show that appellee tampered with the ballots, but they are recited from the record as tending to show that some one had obtained some information to the advantage of appellee, which might well have been obtained by an unlawful opening and manipulation of the ballots themselves. Minson's testimony was not taken, and no presumption that he performed his official duty can be indulged, in the face of the clearly established fact that he disregarded and neglected that duty. Although the recount had at the meeting of the board of trustees called by appellee on May 3 was unauthorized by law, yet it is sufficiently clear, from the evidence, that no ballot was changed on that occasion. The recount then made showed the same result as the one made afterward in the county court, and it would seem clear that if any ballot was changed after they were first counted, such change was made between the seventeenth day of April, when they were delivered to Minson, and the first day of May, when Williams took charge of them. That any such change was made was not clearly proved, but there was evidence tending to prove that certain ballots had in fact been changed. The three judges of election testified that four ballots, which on the trial contained a cross in the circle at the head of the ticket containing appellant's name and a cross in the square opposite appellee's name, thus making the ballots for appellee, were not so marked when they counted them at the close of the polls. It was apparent, however, on cross-examination, that their recollection was not clear as to this fact. It will readily be seen that the crosses in these or other ballots could have

been easily made by any one so disposed, thus changing the vote from one for appellant to one for appellee, without removing the ballots from the wire. While the evidence does not show that the wax seal in the middle of the flap of the envelope was broken, yet it does show, and the envelope which is certified here with the record shows, that part of the flap of the envelope was torn partly off, and it was proved that it was not in that condition when it was delivered to Minson, but was in that condition when' opened for the recount before the village board. It was shown that the flap of the envelope was sealed down in a smooth condition when the package was delivered to Minson. As to how it came to be partly torn off when the envelope was next examined no explanation is attempted.

While the count of the judges of the election was not as carefully made as it should have been, we are satisfied that it is far safer evidence upon which to rely to ascertain the result of this election than the ballots are when all of the evidence is considered. Under the present Ballot law, as the ballots are no longer numbered and the voter cannot be called to show that his ballot has been falsified, and as the ballot itself may be changed more easily than formerly and with less danger of detection, a greater degree of care should be used in the preservation of the ballots, and corresponding caution used in admitting them in evidence to change the result as announced by the judges and declared by the canvassing board.

We are satisfied that the trial court erred in holding that the ballots thus discredited were the best evidence of the result of the election, and in finding that appellee was elected to the office in question. The order and decree of said court are therefore reversed and the cause remanded, with directions to dismiss the petition at the costs of the petitioner.        *Reversed and remanded.*