### GEORGE COLLIER

*v.*

### FRED ANLICKER.

*Opinion filed February 20, 1901.*

1. ELECTIONS—*ballots are best evidence of result if properly preserved.* Ballots are the best evidence of the result of an election if it appears that they have been preserved in the manner and by the officers prescribed in the statute, and have not been so exposed to the reach of unauthorized persons as to afford a reasonable probability of their having been changed or tampered with.

2. SAME—*returns are not conclusive if judges have been careless.* Even though ballots are objects of suspicion by reason of undue exposure, yet the returns are not conclusive of the result if the evidence shows that the judges have made mistakes, and have been so careless in performing their duties as to cast discredit on the returns.

3. SAME—*effect where both ballots and returns are discredited.* If the evidence is such as to discredit, to some extent, both the ballots and the returns, the true result must be determined both from the returns and the ballots and all the circumstances of the case.

4. SAME—*when returns of judges are discredited.* The returns of the judges of an election cannot be accepted as conclusive of the result of an election where they show that more votes were cast than there are names upon the poll-list, which is in evidence, since such fact shows a failure upon the part of the judges to comply with section 57 of the Election law.

5. SAME—*foreign woman whose husband is not naturalized cannot vote.* A vote cast by a foreign-born woman whose husband was never naturalized, and who has not been naturalized herself, is illegal.

6. SAME—*ninety days' residence in county is essential.* Persons who have not resided in the county where a school district is situated, for ninety days preceding the election for school director, are not entitled to vote.

7. SAME—*statutory requirements as to residence apply to women voting at school elections.* The statutory requirements of residence of one year in the State, ninety days in the county and thirty days in the election district apply to women voting at school elections.

8. SAME—*woman under twenty-one cannot vote at school election.* A woman under the age of twenty-one is not entitled to vote at a school election.

9. SAME—*when declarations tending to show disqualification are inadmissible.* Declarations relied upon to show that a voter was disqualified are inadmissible if made subsequent to the election.

10. SAME—*removal, without acquiring a new residence, does not affect right to vote.* Removal for several months, when no new residence is acquired, does not forfeit residence for the purpose of voting.

11. SAME—*temporary absence for business purposes does not affect the right to vote.* The fact that a citizen and legal voter of this State is temporarily engaged in business in another State does not deprive him of the right to vote here.

APPEAL from the County Court of Ford county; the Hon. ALEXANDER McELROY, Judge, presiding.

This is a petition or statement in writing, filed by the appellant, George Collier, on May 19, 1900, and amended at a subsequent date, in the county court of Ford county, for the purpose of contesting the election of the appellee, Fred Anlicker, who was declared elected to the office of school director of school district No. 3, in township No. 25, range No. 7, in the county of Ford. The petition, as amended, prayed that, upon a hearing thereof, if a recount of the ballots and inspection of the poll-book and tally-sheet, together with the evidence produced, should show that the petitioner was elected to the office of school director of said school district, he be declared so elected by the court, and have such other and further relief as equity might require, and to the court might seem meet. The appellee, who was the contestee or defendant below, filed an answer denying the material allegations of the

petition. Replication was filed to the answer. On July 12, 1900, a decree was rendered by the county court, finding that the appellee was duly elected school director for said district, and that the appellant was not elected to said office, and ordering the petition to be dismissed at the cost of the petitioner. The present appeal is prosecuted from the decree so entered by the county court.

On April 21, 1900, a regular school election was held in the school district above named for the purpose of electing one school director. Appellant, and appellee, and one J. H. Beagley, were candidates for said office and voted for at said election. The returns, as made by the judges of such election, and as appeared upon the face of the tally-sheet, showed that appellant received 77 votes, appellee 77 votes, and J. H. Beagley 33 votes. The judges of the election, finding a tie between appellant and appellee, notified them of such tie vote, and ordered them to cast lots for said office, and, as a result of such casting of lots, the appellee was successful, and was declared by the judges of said election to be duly elected director of said district.

The petition alleges that, at said election, only 186 votes were cast, but that the petitioner, relying upon the statement of the judges of the said election that 187 legal votes were cast, submitted to the drawing of lots as aforesaid. The petition also alleges, that there were but 186 names upon the poll-book kept at said election; that the 187th ballot was not taken from the ballot-box; that appellee did not receive a majority of the legal votes cast at said election, or enough of the legal votes to tie with the legal votes received by appellant; that appellant was actually elected; that there were cast at said election 186 votes, as shown by the poll-list, and not 187 votes, as stated by the judges of election; that many illegal votes were cast for Fred Anlicker; and that five certain persons, naming them, voted illegally for appellee for school director, and that such illegal votes were

counted by the judges for appellee. The answer of the appellee admits the holding of the election, but avers that 187 votes were cast at the election, and that appellant and appellee each received 77 votes, and Beagley 33, and, there being a tie between appellant and appellee, the judges decided by lot in favor of appellee. The answer, furthermore, denies that any illegal votes were cast for the appellee, and avers that, if any illegal votes were cast, they were cast for the appellant.

Upon the trial of the contest before the county court, the court permitted the original ballots to be introduced in evidence, and to be counted in the presence of the court and in the presence of the custodian of said ballots, to-wit, the treasurer of said school district. In its final decree, the trial court found that the returns, shown by the tally-sheet, gave the appellant 77 votes, and the appellee 77 votes, and Beagley 33 votes, and also found, that the ballots were not kept according to law, and were not of sufficient force or effect to overcome the returns of the judges of the said election.

L. A. CRANSTON, and KERR & LINDLEY, for appellant.

SCHNEIDER & SCHNEIDER, for appellee.

Mr. JUSTICE MAGRUDER delivered the opinion of the court:

*First*—The same question arises in this case, which has arisen in quite a number of other cases presented to this court, namely, whether the returns of the judges of election shall be conclusive as to the result of the election, or whether the ballots, as introduced in evidence and counted, shall be received to contradict or change the result shown by the returns.

Two rules upon this subject have been laid down by the decisions of this court: First, the returns should not be accepted as conclusive, if the judges of the election

have been so careless in the performance of their duties, as to cast discredit upon their returns. (*Catron* v. *Craw,* 164 Ill. 20; *Dooley* v. *VanHohenstein,* 170 id. 630; *Murphy* v. *Battle,* 155 id. 182; *Caldwell* v. *McElvain,* 184 id. 552). Second, the ballots are considered the best evidence in determining the result of an election, when it appears that they have been preserved in the manner and by the officers, prescribed in the statute, and have not been so exposed to the reach of unauthorized persons, as to afford a reasonable probability of their having been changed or tampered with. (*Catron* v. *Craw, supra; Caldwell* v. *McElvain, supra; Beall* v. *Albert,* 159 Ill. 127; *Bonney* v. *Finch,* 180 id. 133). We have also said in several cases that, even when the ballots are objects of suspicion by reason of a want of proper preservation and by reason of undue exposure, yet, even in that case, the returns will not be conclusive evidence of the result of the election as against the ballots, when the evidence shows that the judges have made mistakes, and have been so careless in performing their duties, as to cast discredit upon their returns. (*Catron* v. *Craw, supra; Dooley* v. *VanHohenstein, supra; Caldwell* v. *McElvain, supra*). It has also been said by this court, that, where the evidence is such as to discredit to some extent both the returns and the ballots, the question as to the true result of the election will be determined by consideration of both the returns and the ballots and all the circumstances of the case. (*Caldwell* v. *McElvain, supra; Dooley* v. *VanHohenstein, supra*).

We cannot escape the conclusion, that the judges of election in the present case were careless in the performance of their duties, and that, as the result of such carelessness, discredit is cast upon the return of the election, as made by them. The poll-list and the tally-sheet are both in evidence. The poll-list shows that only 186 votes were cast at the election, and, yet, according to the return made by the judges of the election, 187 votes were cast, to-wit: 77 for appellant, 77 for appellee, and 33 for

Beagley.   The poll-list was before the judges when they
made the canvass of the election for school director, and
it is difficult to see why the return as made should show
a larger number of votes cast than there were names of
voters upon the poll-list, unless the judges were careless
in the performance of their duties.   Section 58 of the act
in regard to elections (2 Starr & Cur. Ann. Stat.—2d ed.—
p. 1649) provides that, immediately upon closing the polls,
the judges shall proceed to canvass the votes polled; that
they shall first count the whole number of ballots in the
box; that, if two or more ballots are folded together
so as to appear to have been cast by the same person,
all of the ballots so folded together shall be marked and
returned with the other ballots in the same condition, as
nearly as may be, in which they were found when first
opened, but shall not be counted.   Section 58 then pro-
ceeds as follows: "If the remaining ballots shall be found
to exceed the number of names entered on each of the
poll-lists, they shall reject the ballots, if any be found
upon which no number is marked; if the number of bal-
lots still exceeds the number of names entered on each of
the poll-lists, said ballots shall be re-placed in the box,
and the box closed and well shaken and again opened,
and one of the judges shall publicly draw out and destroy
so many ballots unopened as shall be equal to such ex-
cess; and the number of the ballots agreeing with the
poll-lists, or being made to agree, the board shall then
proceed to count and estimate and publish the votes;
and when the judges of election shall open and read the
tickets, each clerk shall carefully and correctly mark
down upon the tally-lists the votes each candidate has
received, in a separate column prepared for that purpose,
with the name of such candidate at the head of such col-
umn, and the office designated by the votes such candidate
shall fill."   Here, as the return of the judges indicates,
there were 187 ballots, and the number of ballots exceeded
the number of names entered on the poll-lists, because

the evidence is clear that there were only 186 names on the poll-list. It was, therefore, the duty of the judges to re-place the ballots in the box, and close it, and shake it, and again open it, and then, by the hand of one of the judges, publicly draw out and destroy one ballot, so as to make the number of ballots agree with the number on the poll-list. There is no evidence in the record, that the course thus prescribed by the statute was pursued by the judges at this election. Inasmuch, therefore, as the return of the judges conflicts with the poll-list, which was before them when they made up their return, such return cannot be regarded as conclusive in regard to the result of the election. It was proper, therefore, for the court to admit the ballots in evidence, and to permit them to be counted, even though the latter may have been objects of suspicion by reason of a want of proper preservation and by reason of undue exposure. This leads to the question of fact as to the steps taken for the preservation and safe keeping of the ballots, after they were counted and the result of the election was declared.

Section 59 of the Election law (2 Starr & Cur. Ann. Stat.—2d ed.—p. 1650) provides, that "all the ballots counted by the judges of election shall, after being read, be strung upon a strong thread or twine, in the order in which they have been read, and shall then be carefully enveloped and sealed up by the judges, who shall direct the same to the officer to whom by law they are required to return the poll-books, and shall be delivered, together with the poll-books, to such officer, who shall carefully preserve said ballots for six months, and at the expiration of that time shall destroy them by burning, without the package being previously opened: *Provided*, if any contest of election shall be pending at such time in which such ballots may be required as evidence, the same shall not be destroyed till such contest is finally determined." Section 60 provides (id. p. 1651): "In all cases of contested election, the parties contesting the same shall

have the right to have the said package of ballots opened, and said ballots referred to by witnesses for the purpose of such contest. But said ballots shall only be so examined and referred to in the presence of the officer having the custody thereof." The proper officer here, to whom the ballots should have been returned, was the school treasurer, because section 12 of article 5 of the act in regard to schools (3 Starr & Cur. Ann. Stat.—2d ed.— p. 3684) provides, that "within ten days after every election of directors the judges shall cause the poll-book to be delivered to the township treasurer with a certificate thereon, showing the election of said directors and the names of the persons elected; which poll-book shall be filed by the township treasurer, and shall be evidence of said election."

On April 21, 1900, the ballots were by the judges strung, and sealed, and delivered by them on five o'clock of that day to one Anderson, the township treasurer. At the same time he received the poll-list, tally-sheet and returns; the latter he filed, and marked the word "ballots" on the package of ballots, so that he could identify the package. The poll-list, tally-sheet and returns, and the package of ballots, having been delivered to the township treasurer by one of the judges of election, were at once placed by the school treasurer in a box, in which he kept his other school papers in his business office. The box was not locked. The treasurer left them in the box Saturday and Saturday night, Sunday and Sunday night until Monday morning, April 23, about seven o'clock, when he showed the packages to one Vohris, a school director, who had been one of the judges of election. Although the box, in which he put the sealed package of ballots, was not locked, yet the door of his office was locked, and his windows were bolted. The treasurer had two sons, one nineteen and the other seventeen years of age, each of whom had a key to his office, but no other person had a key except himself. The treasurer was in

his office after five o'clock on Saturday, April 21, when the package of ballots was delivered to him, and was in his office on Sunday afternoon; and he swears, that no other person could have entered the office without breaking into it; that his sons were not in the office after five o'clock on Saturday, and that there was no one else there after the ballots and poll-books were placed there. On Monday morning, at seven o'clock, the treasurer placed the poll-list, and tally-sheet, and returns, and the package of ballots, in a pigeon-hole in his safe. The safe was kept locked, except when the treasurer had occasion to open it. The papers in question were kept in the safe until they were produced upon the trial of this case. The testimony is, that the papers could not be seen in the pigeon-hole in the safe, where they were deposited, from the office. The testimony is, that the safe was locked when the treasurer was not in the office himself. The clerk of the election, who was also one of the judges of the election, swears that the papers, when shown to him upon the trial, were in the same condition as when he delivered them to the school treasurer, and that they were the same papers so delivered. The treasurer swears, that nobody has had the package of ballots in his hands since they came into his possession, and that said package is in the same condition as it was, when he received it from the judges of election. The testimony as a whole is to the effect, that the ballots were not changed or tampered with.

A re-count of the ballots in the presence of the court, and of their proper custodian, upon the trial of the case showed that only 186 votes had been cast at the election, and that, of these votes, the appellant received 77, and the appellee only 76. The showing, made by the re-count of the ballots, corresponded with the showing made by the poll-list itself. That is to say, both the re-count and the poll-list showed that only 186 ballots had been cast. If, therefore, we accept the re-count of the ballots and

the poll-list as being more conclusive as to the result of the election than the return of the judges, the conclusion follows that the appellant received one more vote than the appellee.

Without, however, actually deciding that, under the facts above stated, the ballots in this case were properly preserved and not unduly exposed within the meaning of the decisions already referred to, it is certainly clear that the ballots are no more discredited than the returns themselves. Hence, in view of the decisions quoted, we have a right to take into consideration, in determining the result of the election, both the poll-list and the ballots and all the circumstances developed by the testimony. Let us proceed, therefore, to notice a few of these circumstances.

*Second*—When the ballots were produced in court to be re-counted, it appeared that one of the ballots, which, was cast for the appellee, was an unnumbered ballot. Section 57 above quoted provides that, after marking and returning the folded ballots, if the remaining ballots shall be found to exceed the number of names entered on each of the poll-lists, the judges shall reject the ballots, if any be found, upon which no number is marked. It would appear, therefore, that, when the judges counted the ballots, they should have rejected this ballot, cast for appellee, upon which there was no number. If it had been rejected, appellee would have had one vote less than the judges decided that he did have.

But whether or not the unnumbered ballot in question was improperly counted for appellee, the evidence shows very clearly that at least three illegal votes were cast for appellee. Ballot No. 186 was voted by one Eliza Hausler. Her testimony shows, that she had lived in this school district for ten years, and was forty-two years old; that she was born in Switzerland; that she was never naturalized; that her husband had been dead for seven years; that, when he died, he had only been in the United States

two and a half years, and that he was never naturalized. Under this evidence she had no right to cast a vote at this election. Counsel for appellee cite the case of *Dorsey* v. *Brigham,* 177 Ill. 250, as supporting the position that a presumption will be entertained in favor of a legal naturalization of this voter. But a careful examination of the case in question will show, that it has no application to the state of facts here presented. In that case we said (p. 262): "The presumption is these voters had become in some legal way naturalized citizens. This naturalization may have come through the naturalization of their husbands. Proof that they were aliens, and had not themselves become naturalized, would not overcome the presumption. The mere absence of proof, as to whether or not their husbands had been naturalized, was equally ineffectual to overcome the presumption. Some proof, tending to show their husbands had not been naturalized, or at least sufficient to create a probability that the husbands had not been naturalized, was essential to overcome the presumption of innocence, and of the regularity of the acts of the judges of the election, and warrant the court in declaring the votes had been cast in violation of law." (*City of Beardstown* v. *City of Virginia,* 76 Ill. 34; *Same* v. *Same,* 81 id. 541; *Behrensmeyer* v. *Kreitz,* 135 id. 591). In the case at bar, however, Mrs. Hausler swore, not only that she was born in a foreign country, and that she was never naturalized in the United States, but that her husband had never been naturalized as, indeed, he could not have been, having only resided in the United States two and one-half years. Therefore, the proof, which under the ruling in *Dorsey* v. *Brigham, supra,* was required to overcome the presumption of legality, was forthcoming upon the trial of this case.

Again, ballots Nos. 124 and 134 were voted by Fred Lohmire and Annie Lohmire, his wife. The votes, cast by Lohmire and his wife, were illegal, because the testimony shows clearly that these two voters had not lived

in Ford county, in which the school district in question is located, ninety days before the election. Prior to March 1, 1900, they lived in Livingston county, and did not move into Ford county into the district in question until about March 1, 1900, which was less than three months before April 21, 1900, when the election occurred. Section 65 of the Election law (2 Starr & Cur. Ann. Stat. p. 1652) provides, that a person to be entitled to vote in this State must have resided in the State one year, in the county ninety days, and in the election district thirty days next preceding any election therein. The same requirement as to a residence of one year in the State, ninety days in the county and thirty days in the election district applies to women voting at school elections. (Ibid. pp. 1741, 1742; *People* v. *English*, 139 Ill. 622; *Plummer* v. *Yost*, 144 id. 68).

After deducting the illegal votes cast by Eliza Hausler, Fred Lohmire and Annie Lohmire, the number of legal votes cast for the appellee was only 74, if the unnumbered ballot already referred to should be counted.

It is insisted by the appellee, that the same number of illegal votes was cast for the appellant. Ballot 149, cast by Florence Hipscher, was for the appellant. This vote was unquestionably illegal, because Florence Hipscher, when she voted, was only nineteen years old, and, under the statute and the authorities already referred to, she was not entitled to vote until she reached the age of twenty-one years. Ballot No. 111, cast by L. H. Kerrick, and ballot No. 120, cast by Lucy B. Putney, were for the appellant. It is contended by appellee, that the votes cast by the two last named persons were illegal. The testimony does not show clearly the illegality of these votes, especially the vote of Lucy B. Putney. It is a well established presumption of law, that a person, who has voted, has the legal right to vote, until the contrary is shown. (*City of Beardstown* v. *City of Virginia, supra; Behrensmeyer* v. *Kreitz, supra; Dorsey* v. *Brigham, supra*).

It is not denied that Kerrick had resided in Illinois one year, and in the school district more than thirty days, when he cast his vote. It is claimed, however, that, when he voted, he was not a resident of Ford county, but was a resident of McLean county, and had not lived in Ford county ninety days before April 21, when the election occurred. The proof is not clear upon this point. A part of the testimony, relied upon to show that Kerrick was a resident of McLean county within ninety days before he voted, consists of admissions alleged to have been made by him after he voted; but the rule in this State is that, if the declarations of voters for the purpose of showing that they were not qualified to vote are made subsequent to the election, they are inadmissible. (*Behrensmeyer* v. *Kreitz*, 135 Ill. 591; *City of Beardstown* v. *City of Virginia*, 81 id. 541; *Same* v. *Same*, 76 id. 34; *Kreitz* v. *Behrensmeyer*, 125 id. 141). The testimony tends to show that Kerrick worked upon his father's farm, located in this school district, during the summer and fall of 1899, and that in September he went away from the district to be married, and returned thereto about the first of March, 1900, and lived there up to the time of the election. It does not appear that, when he left the district in September, 1899, it was for the purpose of acquiring a residence elsewhere, or for any other than a mere temporary purpose. Whether a party has permanently left his residence, or has acquired a new residence, depends upon the intention with which he acts in the premises. Removal for several months, when no residence is acquired, does not forfeit residence for the purpose of voting. (*Smith* v. *People*, 44 Ill. 16; *City of Beardstown* v. *City of Virginia*, *supra; Kreitz* v. *Behrensmeyer*, *supra*). But, if it be admitted that Kerrick was an illegal voter, the proof is not at all sufficient to overcome the presumption that Lucy B. Putney was a legal voter. The proof shows, that she lived in the school district from the 10th of September, 1899, to April 21, 1900, when the election occurred. She had,

therefore, been a resident of Ford county more than ninety days before the election and of the school district more than thirty days before the election. Before she came into the school district she lived at Serena, Illinois, where her parents lived, and which had prior to that time been her own home. There is some evidence that, before she came into the district, she taught school in Nebraska, but the proof does not show that she gave up her residence in Illinois when she went to Nebraska. Where a party is a citizen and a legal voter of this State, the fact that he or she is temporarily engaged in business in another State will not deprive him or her of the right to vote in this State. (*O'Hair* v. *Wilson*, 124 Ill. 351; *Smith* v. *People*, 44 id. 16; *Kreitz* v. *Behrensmeyer*, 125 id. 141; *Behrensmeyer* v. *Kreitz*, 135 id. 591; *City of Beardstown* v. *City of Virginia*, 81 id. 541).

If the votes of Florence Hipscher and L. H. Kerrick, which were cast for appellant, be rejected, appellant would still have 75 votes in his favor. Both the returns and the re-counted ballots show that appellant received 77 votes. The re-counted ballots, corresponding as to the number of voters with the poll-list used at the election, show that appellee received only 76 votes, and that, of these 76 votes, three were illegal votes, so that, if only 76 votes were cast for him, he had only 73 votes when the illegal votes are rejected; or, if it be held that 77 votes were cast for him, he only had 74 votes when the three illegal votes are rejected. Therefore, in either case, and in any view of the matter, appellee received a less number of votes than appellant, and was not elected.

Accordingly, the decree of the county court, in declaring that the appellee was elected and dismissing the petition, was erroneous.

The decree of the county court is reversed, and the cause is remanded to that court for further proceedings in accordance with the views herein expressed.

*Reversed and remanded.*