.J. D. WELSH, Appellee, *vs.* GEORGE SHUMWAY, Appellant.

*Opinion filed December 17, 1907—Rehearing denied Feb. 7, 1908.*

1. ELECTIONS—*opening and counting of ballots does not preclude evidence that they were tampered with.* The fact that the ballots have been opened and counted upon an election contest does not preclude the admission of evidence to show that the ballots were tampered with.

2. SAME—*what does not justify throwing out the vote of a precinct.* The mere fact that the city clerk, instead of the judges of the election, carried the ballots from the polling place to the city hall after they had been counted and properly sealed, does not justify throwing out the vote of the precinct in a subsequent contest.

3. SAME—*sufficiency of nomination papers cannot be questioned on a contest.* Jurisdiction in an election contest is limited to the question who was elected, and the sufficiency of the nomination papers, which were not objected to in the manner provided for in the statute, cannot be inquired into.

4. SAME—*the city council should fix boundaries of election districts in city elections.* For city elections, in cities organized under the general law and located in counties under township organization, the city council, and not the county board, should establish the boundaries of the election precincts or districts as well as name the polling places and the judges and clerks.

5. SAME—*petition to contest election need not specifically name certain alleged illegal voters.* It is not essential that a petition to contest an election specifically name certain of the alleged illegal voters so as to permit contestant to make proof as to such voters.

6. SAME—*rule as to overcoming presumption in favor of legality of votes.* While one contesting an election has the burden of overcoming the presumption in favor of the innocence of an alleged illegal voter and of the regularity of the acts of the election officials, yet it is not necessary that the evidence shall be sufficient to fully rebut such presumptions in order to require proof of those facts by the opposite party.

7. SAME—*a witness who has examined records may state that they show nothing with reference to a certain matter.* In an election contest, where it is claimed by the contestant that the city council has never established any election districts, a witness who has examined the records should be allowed to state that they show nothing with reference to the matter, if that is the fact.

8. SAME—*election districts should be formed at least thirty days before election.* An election district for a city election should be

established by the city council at least thirty days before the election is held, in order that residence for the proper period may be acquired before the election by persons residing in the district.

9. SAME—*when vote should not be rejected for want of voter's mental capacity.* While the vote of a person *non compos mentis* ought not to be received, yet proof of the fact that a voter was old, decrepit and extremely feeble does not justify rejecting his vote, where a judge of the election testifies the voter answered all questions in a manner indicating that his mind was not unsound.

10. SAME—*what constitutes a sufficient residence.* While the Election act provides that a permanent abode is necessary to constitute a residence, yet if a man is working in a city for an indefinite period and has no other residence or home to which he intends to return, such city may be regarded as his residence even though he may not intend to remain there permanently.

11. SAME—*evidence of a voter's intention is admissible but not conclusive.* Upon the question of residence, in an election contest, a voter may testify as to his intention in that respect, but such testimony is not conclusive.

12. SAME—*question of residence largely one of intention.* One who rents a house less than thirty days before the election and moves part of his goods there but keeps part of them at his former home in another election district, intending to remain, and in fact remaining, at his former home until election, retains his old residence; but one who begins to move into a house more than thirty days before the election, with the intention of changing his residence, may vote in the district where the house is situated, although he did not sleep there until less than thirty days before election.

13. SAME—*attempt to vote in certain precinct not conclusive of voter's legal residence.* If a voter was, in fact, entitled to vote in the election district to which he had recently moved, the fact that he first attempted to vote in the district in which was located the house he had formerly occupied and in which he had left some of his belongings, does not justify rejecting his vote upon the ground that his attempt to vote in the latter district showed an intention conclusively establishing his legal residence in such district.

14. SAME—*rule as to college students voting.* A college student, as respects the matter of residence, may vote in the place where the college is located if he is free from parental control, regards the place where the college is located as his home and has no other home to which to return; but his mere presence at the college is not sufficient, as his residence must be *bona fide,* with no intention of returning to his parental home after completing his studies.

APPEAL from the Circuit Court of Knox county; the Hon. JOHN A. GRAY, Judge, presiding.

COOKE & STEVENS, and E. J. KING, for appellant.

WILLIAMS, LAWRENCE, WELSH & GREEN, CARNEY, CARNEY & FRANK, ARNOLD & ARNOLD, HARDY, WELSH & HARDY, W. T. SMITH, and A. M. BROWN, for appellee.

Mr. JUSTICE CARTER delivered the opinion of the court:

This is a contest as to the election of mayor of the city of Galesburg, held April 2, 1907. Appellant was declared elected by the city council on the face of the returns. As we understand the record, appellant received on the face of the returns 2445 and appellee 2439 votes. This contest was brought in the circuit court of Knox county, and upon the ballots being opened and counted resulted in the court finding that appellee should have counted for him 2446 and appellant 2428 votes. That court then entered a decree in favor of appellee declaring him legally elected as mayor, and an appeal was prayed and allowed to this court.

The returns of the judges and clerks are not found in this record. There was considerable discussion as to the admission of the ballots in evidence, but they were all finally admitted and counted without any objection being made or an exception taken by either party. After the ballots were counted a large amount of evidence was presented by appellant to show that certain persons who he claimed had voted for appellee were illegal voters. Following the taking of this evidence, near the close of the case, he introduced testimony for the purpose of showing that the ballots had not been properly cared for and guarded by the city clerk from the time they were received by him until the returns were canvassed by the city council.

The ballots were kept in a vault to which several of the city officials had keys. It is not claimed, however, that any

of them improperly disturbed the ballots, but it is contended that the vault doors were left open during the day and that the ballots might possibly have been tampered with by outsiders. Without discussing this evidence in detail, we deem it sufficient to say that there is no testimony in the record that even tends to show that any person improperly tampered with the ballots or that there there was any reasonable opportunity for outsiders so doing. On the contrary, we think the great weight of the evidence tends to show that the bags in which the ballots were sealed upon the night of the election remained sealed in exactly that condition, and the ballots were undisturbed up to the time of this contest. It is not contended that there is any testimony tending to show that the bags containing the ballots had been disturbed in any manner up to the time the returns were canvassed by the city council. Moreover, it is clear from this record that appellant consented to the opening of the ballots, and that at various times during the discussion the court stated that the ballots had been properly kept and appellant admitted that this statement was correct. The record is clear that he agreed they should be opened and counted. There is nothing shown in this record that would justify this court in refusing to receive these ballots in evidence. *Smith* v. *Reid,* 223 Ill. 493.

We do not wish to be understood as holding that after the ballots are opened and counted, evidence cannot be heard to show that they have been tampered with. The contrary is true. *Kreitz* v. *Behrensmeyer,* 125 Ill. 141.

Appellant complains that the city clerk, on the night of election, went with certain police officers to the second precinct of the Fourth ward, after the ballots had been counted and sealed by the judges, and took the ballots from the polling place and carried them to his office in the city hall. It was the duty of the judges to bring these ballots to the city clerk's office. There is nothing shown in this record that would justify the city clerk in obtaining the ballots in the

way he did, but there is no evidence that in any way tends to show that he or anyone else tampered with them. On the contrary, the evidence shows clearly that the ballots were in the same condition when opened and counted by the court as when sealed. We do not think the law justifies the throwing out of a precinct simply because a person not authorized by law takes the ballots, after they are properly sealed, from the polling place to the city clerk's office. After proof had been made as to the bringing in of these ballots, the court said: "Gentlemen, I will exclude the precinct if the contestee objects, but if there is no objection the ballots may be opened and counted." There was no objection, and the count gave appellant 220 votes while appellee received only 205. If these ballots were thrown out appellant would suffer a net loss of 15 votes. Viewed in any possible light, there is nothing to show that appellant was injured in any way by counting the votes of this precinct.

Appellant also discusses a number of questions with reference to the refusal of the trial court to count certain ballots, apparently because not properly marked. It is also contended that certain ballots should have been counted that were thrown out because the judges' initials were not placed upon the back, as required by law. It appears from the briefs, though there is nothing in the record to make this point clear, that the ballots upon which the initials of the judges were not placed, and which were not counted on that account, were about equally divided between the parties to this contest. Appellant also complains of the decision of the court as to the counting of certain ballots. It is impossible to tell whether the court ruled in accordance with the law in counting or rejecting the ballots under discussion. Neither the original ballots nor *fac similes* have been preserved in the record. Appellant contends that he had some agreement with appellee as to bringing these ballots to this court. The record is silent on this question, and if any of the original ballots were to be presented here it

must be by order of the lower court, with which, in the present condition of the record, we have nothing to do.

Appellant urges that appellee's nomination papers are not in accordance with law. We have held that the jurisdiction in an election contest is limited to the question as to who is elected. (*Dilcher* v. *Schorik,* 207 Ill. 528.) We have also held that the failure of a candidate to object to his opponent's certificate of nomination in the manner provided by statute waives the objection, and it cannot thereafter be raised in an election contest. *Schuler* v. *Hogan,* 168 Ill. 369.

One of the chief questions presented by the briefs is whether the city council of Galesburg or the county board of Knox county is authorized to fix the election boundaries of the precinct or district for the city election. Knox county is under township organization. In order to decide this question it will be necessary to examine at some length the history of legislation as to the conduct of elections in State, city, county, incorporated villages and towns, previous to, at the time of and since the adoption of the present constitution.

It is admitted by counsel that the city of Galesburg is incorporated under the general act for the incorporation of cities and villages. Moreover, this fact must be judicially noticed by the court. Hurd's Stat. 1905, p. 291; *Potwin* v. *Johnson,* 108 Ill. 70; *City of Rock Island* v. *Cuinely,* 126 id. 408.

Cities and incorporated villages in this State, when the constitution of 1870 was adopted, were generally under special charters granted prior thereto. (Underwood's Stat. 1878, p. 214, note *a.*) Many of them are still acting under those charters. These cities usually managed and controlled their own elections, appointed the judges or inspectors (as they were sometimes called) and established the voting districts. The general Registration act of 1865, now in force, recognized this fact when it provided (sec. 1) that persons

authorized by law "or appointed pursuant to any town or city ordinance to act as judges or inspectors of elections in any town, city or ward or other election district or precinct in this State, shall constitute a "Board of Registry.' " Hurd's Stat. 1905, par. 135, p. 875.

The first General Assembly after the adoption of the constitution passed the general act for the incorporation of cities and villages, which went into force July 1, 1872. (Laws of 1871, p. 218.) Section 9 of article 4 of that act as then enacted and still in force, without amendment, reads: "The city council shall designate the place or places in which the election shall be held, and appoint the judges and clerks thereof, and cause notice to be printed in some newspaper published in such city, if there be one, or posted at each voting place in such city, of the time, places of election, and of the officers to be elected, for at least twenty days prior to such election." (Hurd's Stat. 1905, p. 298.) The same legislature passed a general act in regard to. elections. (Laws of 1871, p. 380.) Sections 29 to 35, inclusive, of this act provided for the conduct of general and special elections, as to the formation of election districts or precincts and the selection of judges. Sections 29, 30 and 32 refer to election precincts in counties not under township organization. Section 31 provided that in counties under township organization "each town shall constitute an election precinct," but the county board may divide the town into election districts, as convenience may require. Section 33 provided for the appointment of judges in counties under township organization, stating that when the town is divided into several districts the county board shall appoint three judges, the supervisor, assessor and collector to be the judges in their respective districts. Section 35, that all these judges should hold until their successors are appointed. The judges were to be appointed each year. These sections have been amended many times since that date, but we shall only refer to those amendments that af-

fect the question under discussion. This election law now in question did not refer in any way to or recognize the conduct of city elections. While it went into force the same day as the general City and Village act,—that is, July 1, 1872,—the Election law was approved April 3, 1872, while the general City and Village act was approved later,—that is, April 10, 1872.

It is contended that section 10 of article 4 of said City and Village act, as then enacted and still in force, shows that the general Election law controls city elections wherein it provided that the conduct of city elections under that act, and the contesting of the same, "shall be the same, as nearly as may be, as in the case of the election of county officers, under the general laws of this State." We think it is clear from these two laws, considered together, that the legislature intended to authorize the city council, under the general act incorporating cities and villages, not only to appoint the judges and name the polling places, but to fix the boundaries of the election precincts. It might well be argued that the power to fix polling places necessarily carried with it, as a practical matter, the power to establish election districts and fix their boundaries. Under the general act for the incorporation of cities and villages the city is authorized to elect city officials. If there were no other provision in the law referring to the election of city officers or the regulation of elections it would necessarily follow that the city authorities would have the power to establish election districts for elections as well as fix the polling places and name the judges of election. A municipal corporation has all the powers necessary to do any act that it is authorized to do, and the act of electing officers comes within the fair intent and purpose of its creation, even though not conferred by its charter. (1 Dillon on Mun. Corp.—4th ed.—sec. 90.)

Whatever doubt there may be as to cities, under the general act for incorporating cities and villages, having the

power to fix the election districts, that doubt must be en-
tirely removed by a consideration of the subsequent legis-
lative enactments on the subject. It should be noted, how-
ever, before commencing a discussion of these laws, that
the general Election law as to counties under township
organization used the town as the unit for the election
precinct, and provided that the town, if too large for one
precinct, should be divided into election districts, and this
method has been followed in all the amendments of the
general Election law touching State and county elections.
No reference in that law has ever been made to the conduct
of city elections. The ward boundaries, or the boundaries
of the city or incorporated village or town, have not been
mentioned in any way in that law or in any subsequent
amendments as to the formation of precincts or districts.

The control of township elections previous to the adop-
tion of the present constitution must be considered in order
to get a fair understanding of the law on this subject.
In 1861 it was provided that the election of town officers
should be held on the first Tuesday of April. (Hurd's Stat.
1905, p. 2009.) This section of the law has remained un-
changed to this date. The Twenty-eighth General Assem-
bly revised the entire Township Organization law by an
act in force March 4, 1874. (Laws of 1873-74, vol. 2,
p. 209, Myers' ed.) We find here a recognition, in sec-
tion 7 of article 7 of that act, that towns which had incor-
porated cities or villages within or partly within and partly
without the limits of the town might need more than one
polling place and election precinct, and providing that the
county board should furnish additional ballot-boxes and
arrange for the conduct of town elections therein. (Laws
of 1873-74, vol. 2, p. 281, Myers' ed.) But this section,
as originally enacted, referred in no way to city elections.
March 9, 1877, this last section of the Township Organiza-
tion law was amended in several particulars. Among these
a provision was inserted that in towns which lie wholly

within the limits of an incorporated city the "common council of such city shall divide each of such towns into election precincts and designate the polling places in each precinct. * * * The common council of such city shall also appoint three judges of election for each of such precincts, who may be the same persons as are appointed as judges for an election for city officers held on the same day." (Laws of 1877, p. 214.) This amendment also provided that elections for town and elections for city officers in such cities and towns should be held on the same day and at the same place.

It is plain from this last amendment that the legislature understood that cities formed their own election precincts and fixed the boundaries as well as appointed judges and clerks. The same legislature recognized this fact in another act passed May 23, 1877, which provided that the county board could organize, under certain conditions, territory within any city as a town, and that the territory of any city now organized within the limits of any county under township organization, and not situated within any town, should be deemed to be a town, and that all town officers elected as aforesaid shall be elected at the annual charter election of the city, and "all general elections held in such city and town shall be held at the same voting places as the city elections, with judges and clerks appointed in like manner as for city elections;" that the power vested in such town should be exercised by the city council, and that the city council, by ordinance, might provide that the offices of city and town clerk may be united in the same person. (Laws of 1877, p. 212.) This act is still the law in this State. (Hurd's Stat. 1905, p. 2019.) It seems to be agreed by both parties that the city of Galesburg has taken advantage of this act, and that it has been provided by ordinance that the city clerk shall act as town clerk. The same session of the legislature amended section 1 of article 4 of the general City and Village act with the same

thought in mind, viz., to provide that in cities which included wholly within their corporate limits a town or towns, the elections for city officers should be held at the same time as the town election, (the first Tuesday of April,) instead of the third Tuesday of April as theretofore. (Laws of 1877, p. 54.)

In 1879 the legislature passed a law which, as we understand the record in this case, must have applied to the city of Galesburg, as the town and city of Galesburg contain the same territory. It provided that thereafter "the regular charter election for the election of city officers of any city having the same territory as an organized township, shall take place on the same day provided by law for the township election, to-wit, on the first Tuesday of April, anything in the charter of such city to the contrary notwithstanding, and such charter and township elections may be conducted in all respects as provided in and by an act entitled 'An act to amend section 7 of article 7 of an act entitled 'An act to revise the law in relation to township organization,' approved and in force March 4, 1874, approved and in force March 9, 1877: *Provided*, that this act shall not be so construed as to require any city to hold its charter election oftener than its charter may prescribe." (Laws of 1879, p. 59.) That law is still in force, (Hurd's Stat. 1905, par. 298, p. 353,) and plainly requires, even though that had not been the practice theretofore, that the city of Galesburg should establish the election precincts and fix their boundaries for city elections.

The next legislature amended section 13 of article 11 of the general City and Village act. The section as it originally went into force in July, 1872, provided that the annual election of the village should be on the third Tuesday of April. This amendment provided that in villages where the territorial limits coincide with the territorial limits of the township the village election should be held on the same date as the township election, namely, the first Tues-

day of April. ' (Laws of 1881, p. 59.) The legislature, at
its 1885 session, amended sections 29, 30, 31, 32 and 33 of
the general Election law. Section 29 was amended to read
as it now stands. (Hurd's Stat. 1905, p. 860.) The last
sentence of this section reads: "In counties under town-
ship organization, each town shall constitute an election
precinct,"—thus still recognizing the township as the unit
in the formation of election districts. Section 30 as then
amended provided for the formation of precincts in every
county, whether organized into townships or not, and that
the precincts should contain, as near as practicable, 400
voters and in no case more than 450, and that the polling
places having been fixed, all general and special elections
should be held at the place so fixed. Section 33 provided
for the selection of judges in counties under township or-
ganization, and said: "When a town is not divided into
election districts, the supervisor, assessor and collector
thereof shall be the judges of elections in such town;"
when the township is divided into several election districts,
then the county board shall appoint the judges,—the su-
pervisor, assessor and collector being appointed in their
respective districts. (Laws of 1885, pp. 194, 195.) This
same legislature amended section 7 of article 7 of the Town-
ship Organization act, providing not only, as theretofore,
that in towns which lie wholly within the limits of an in-
corporated city or in any town whose territorial limits are
co-extensive with the territorial limits of any incorporated
city, but also when such a situation existed as to towns in
any village or incorporated town, the common council of
such cities or board of trustees of such village or incorpo-
rated town should divide the town into election districts
and designate the polling places, and that the election for
town officers should be held at the same time as the election
of officers of cities, villages or incorporated towns. (Laws
of 1885, p. 249.) In 1889 the legislature again amended
this section, and then for the first time provided that in

township elections (other than those entirely within the limits of cities, villages and incorporated towns,) the county board should appoint judges for all precincts, where the town was divided into more than one. (Laws of 1889, p. 359.) In 1903 the legislature again amended section 33 of the general Election law, and added to the provision already in the law that when the county board had fixed the places for holding elections all general and special elections should be held at the places so fixed, another provision that "town meeting elections or town elections" should also be held at these places. (Laws of 1903, p. 172.) While thus recognizing specifically for the first time in the general Election law the regulation of town meetings and town elections, the legislature did not mention in any way city elections or the formation of voting districts for such elections. The legislature in 1905 amended section 33 of the general Election law as to the method of appointing judges in counties under township organization. As then amended and now standing it recognizes that the township is the unit, for it provides that the township supervisor shall be appointed as a judge of election in the district or precinct in which he resides. (Laws of 1905, p. 203.)

A study of the various acts above referred to and briefly touched upon in this opinion demonstrates that the legislature has always intended that for city elections the city authorities should not only name the polling places and appoint the judges and clerks, but should establish the election precincts and fix their boundaries. A consideration of the present general Election law with the various changes made since it was adopted compels the conclusion that it was never intended by this act to control city elections; that city elections, so far as they are controlled by the general Election act, are so controlled because of section 10 of article 4 of the general City and Village act, and not because of any special reference in the general Election act to city elections. The town in counties organized into townships has always

been recognized by that act (as it is now) as the unit for an election precinct, and the boundaries of the town must be recognized in forming the precinct. No reference is made in any way to ward boundaries, or to the boundaries of cities or incorporated towns, in regulating, under the general Election law, the formation of voting precincts. In other words, the precincts or districts in a county organized into townships must be formed entirely within the town and not cross town lines. This being so, it can readily be seen that the boundary lines of precincts for city elections could not ordinarily be fixed the same as for county elections. It is well known that many towns are not wholly within the limits of an incorporated city or village, and that in forming precincts or districts for the county and State elections the county board cannot divide along the line of the city or village limits or ward lines so as to coincide with the city, village or ward limits, though there are many places where only a small portion of the town contains votes outside of the limits of the city or village. There is no authority under the general Election law, or any of these laws we have referred to, for creating a separate election district or precinct from the territory outside of the city or incorporated village and within the township. There are many townships in the State that have more than one incorporated village or town within their limits. This presents such a question of practical difficulty in the formation of election districts that it is impossible to have the same boundaries for city or village elections,—especially village elections,—as for county elections; and this is true even though the provision of the general Election law be not observed as to the number of voters required in a given district. In an incorporated city, for city elections the ward lines must necessarily be considered in forming election districts, while in incorporated towns and villages trustees are voted for in the entire town. Doubtless in cities, where practicable, the public authorities have tried to have

the precincts for city elections and fall elections coincide as to boundaries, in order to make it more convenient and less liable to mislead the voters; but to do this legally, the city council for the city election should by reference to the precincts formed by the county board, or in some other manner, show the limits or boundaries of the election precincts or districts, or the county board may, by reference to the districts formed by the city council, make them a part of its record.

We have used the words· "precinct" and "district" in this opinion interchangeably. Counsel for appellant contends that these words ought not to be so used, but we have already held in *People* v. *Markiewicz,* 225 Ill. 563, that the meaning given to each of these words at different times, has varied; that some times the word "precinct" has been used to mean the larger territory and the district was a subdivision thereof, while at other times the word "district" has been used as covering a larger territory than the precinct. As was said in that opinion, a reading of the Election law on this subject shows that the words are frequently used interchangeably, and that the meaning must be gathered very largely from the connection in which they are used in each instance.

Our conclusion must be that the city authorities of the city of Galesburg were the proper authorities to establish the boundaries of the election precincts or districts for the election here in question.

Appellee contends that as appellant's 'answer did not specifically name certain of the alleged illegal voters the law did not permit him to make proof as to such voters. With this we do not agree. On this point see *Kreitz* v. *Behrensmeyer,* 125 Ill. 141; *City of Beardstown* v. *City of Virginia,* 81 id. 541; *Behrensmeyer* v. *Kreitz,* 135 id. 591; *Furguson* v. *Henry,* 95 Iowa, 439.

Appellee, apparently content to rely. on the result shown by the re-count of the votes, has not attempted to prove

that any votes were illegally cast for appellant, while, on the other hand, appellant contends that there were some 41 illegal votes counted for appellee. Appellant contends that thirteen who voted for appellee for mayor were residents of the first voting district of the Fifth ward but voted illegally in the second district of that ward, according to the districts established by the county board. The basis for this contention is, that there is no evidence in the record showing that the city council of Galesburg ever attempted, by ordinance or otherwise, to exercise the right to establish the election precincts for the city election. Appellee in his petition stated that the city council formed these precincts, and he contends that no proof on this point is necessary; that where the charge is made of illegal voting, it involves not only a criminal offense on the part of the voter but also the recognition of it on the part of the election officers, and that the burden is on the contestant to overcome the presumption of law as to the innocence of the voter and the regularity of the actions of the election officers. While the law cast upon appellant the burden of proving that these were illegal votes, full and complete proof in rebuttal of the legal presumptions just referred to is not required. In order to remove these presumptions it is only necessary that proof should be produced sufficient to render the existence of the negative probable. *Rexroth v. Schein,* 206 Ill. 80, and cases cited.

The proof as to the point that these election precincts were not established by the city council is, in substance, as follows: Appellant was sworn as a witness and was asked to make a statement telling what effort he had made to find the boundary lines of the districts. To this an objection was made and sustained by the court. The witness then said: "I want to prove that the city council never made an effort to establish the boundary lines,—for the purpose of showing the city council have never attempted to form any election districts within the city of Galesburg other

than to establish ward boundaries. Now, we offer to prove by George Shumway, mayor, and the city clerk, and the records of the city of Galesburg, that the city council of the city of Galesburg have never divided the city of Galesburg into election districts, and that the election districts of the city of Galesburg have been fixed by the board of supervisors of Knox county and that all elections have been held under said districts so formed by the board of supervisors, and these records are offered to show the boundaries of all election districts in the city. This last we want to prove by the records of the board of supervisors and by the records of the city of Galesburg." At various times while this offer was being made objections were made and sustained by the court, but appellant continued with his offer until he completed it. It is not shown that the records of the city of Galesburg were present in court at the time the offer was made, but it appears that some of the records of the county board which the appellant desired to offer were there. The objections do not appear to have been made by counsel or sustained by the court on the ground that a proper offer was not made or because the records of the city of Galesburg were not in court, for the court interrupted, while this offer was being made, with this statement: "When a town is formed or the annexation of a city that exists, election districts are in existence until they are changed. I don't see where any testimony would throw any light."

If this offer was properly made we think the proof should have been admitted, for it might have been of such nature that the burden of proof as to the legal formation of these districts would have been shifted and the appellee thereby compelled to show that there had been districts legally formed. *Behrensmeyer* v. *Kreitz,* 135 Ill. 591.

The witness was sworn in this case and a question asked, which, while it might have been in better form, was not objected to for that reason and plainly showed what

appellant desired to prove. The proof offered was as to negative facts. The decisions, while not numerous, are not in harmony as to how such facts should be proved. It has frequently been held that where the results of voluminous facts contained in writings or of the examination of many records and books are to be proved, and the necessary examination of this documentary evidence cannot be conveniently or satisfactorily made in court, it may be made by an expert accountant or other competent person and the results thereof be proved by him, if the books, papers or records themselves are properly in evidence. It seems, however, that the jury are not bound by the result thus ascertained, but may make their own calculations from the books and papers in evidence. (17 Cyc. 511, and authorities cited.) It was held in *Hoffman* v. *Pack*, 114 Mich. 1, that the county clerk might testify, from an examination of the records of the board of supervisors, that the signatures of the chairman and clerk were wanting and that a certified transcript of a portion of the records contained all that appeared therein on a particular subject. Other States have laid down rules along the same general lines. Whether or not the records or writings show a certain fact cannot generally be proved by parol evidence unless the documents themselves are in court. (2 Wigmore on Evidence, secs. 1230, 1244, and cases cited; 9 Am. & Eng. Ency. of Law,— 2d ed.—pp. 933, 935, and cases cited.) In this proceeding the records of the city of Galesburg should have been present in court, (whether they were or not cannot be told from the record before us,) but for the convenience of the court to expedite the trial it would have been entirely proper for a witness to have examined the records and stated to the court that they showed nothing with reference to the city council establishing the voting precincts for the city election. The offer was to show that the city of Galesburg had never taken any action to divide the city into election districts for city elections, but that such election districts

had always been fixed by the county board. As we have seen, the law requires that the election districts for the city election should be fixed by the city council. We think the offer was sufficiently specific, in the present state of the record, to require the court to permit the introduction of the evidence. Had that been done it might have shown that the city council had adopted, by reference, the districts established by the county board, or in some other way had adopted election precincts.

The last records of the county board establishing the election districts for the fall elections, offered in evidence,. were dated September, 1902. All of the thirteen voters who it is alleged voted illegally in the wrong district in the Fifth ward had resided at their different places of residence for several years previous to the time of voting, and some ten or eleven of them had voted several times previously in the same district in which it is now charged they voted illegally.

In this same connection it is also urged that nine voters who cast their ballots for appellee for mayor voted in the first district of the Second ward, when, according to the districts fixed by the county board, they should have voted in the second district of that ward. In addition to the offered proof referred to heretofore, which was made to cover these nine voters as well as the thirteen, appellant offered a resolution of the city council which read: "Resolved by the city council of the city of Galesburg, Illinois, that the boundary line between the first and second precincts of the Second ward in said city be and the same are hereby changed and altered so that hereafter block 6 in Gale's first addition to said city shall be included in and be a part of the first precinct of said ward." He introduced the records of the city council showing that this resolution was adopted March 4, 1907. As the election was April 2, 1907, less than thirty days intervened between the passage of the resolution and the day of election, and it is contended

that therefore these nine votes were illegally cast in that precinct. Proof was offered by appellant for the purpose of showing that all of these nine voters lived in said block 6 and were transferred by this resolution from the second precinct to the first precinct of the Second ward. Appellee contends that the resolution does not show that all of this block was transferred from one precinct to the other, and that there is no clear proof in the record that these nine voters did not live in that part of the block that was not transferred. The resolution itself is not entirely clear on the point as to whether the entire block was transferred, but the testimony of every one of the nine voters was that this was the first time he had voted in said first precinct. Some of them testified that for several years previous they had voted in the other precinct of that ward. The record shows clearly that these nine men had resided at their then places of residence more than thirty days previous to the election and that they had all the other qualifications of legal voters.

Appellee further contends that the law does not require the election districts or precincts for the city elections to be established longer than twenty days before the election, and that the constitutional requirement as to residing thirty days in an election district next preceding an election will be observed if the voter has lived in his place of residence thirty days immediately preceding the election, even though the boundaries of the district have been changed less than thirty days before election, thus placing him in another district. He relies upon the fact that section 9 of article 4, heretofore quoted, states that the notice of election is not required to be published more than twenty days prior to the election, and therefore argues there is no necessity of forming the precincts before that time.

We find nothing in our statutes specifically fixing the time when the city election precincts shall be formed, but section 3 of article 4 of the Incorporation act for cities and

villages provides that all persons who have resided within the city or village for thirty days next preceding the election may vote for city and village officers. (Hurd's Stat. 1905, p. 297.) The general Registration law requires the board of registry to be in session at least three weeks before election. (Hurd's Stat. 1905, p. 875.) While under the letter of the law there may be some basis for the contention of appellee, we are inclined to think that not only the spirit of the law, but sound public policy as well, requires that the election districts should be formed at least thirty days,—the constitutional time of residence in a district,—before the election. (McCrary on Elections,—4th ed.—sec. 95, and cases cited.) If a ward is divided into voting districts, thirty days' previous residence must be had in the district as formed. (*People* v. *Markiewicz, supra.*) If this district was not formed at least thirty days before the election, then, under the reasoning of the *Rexroth case, supra,* these votes must be held illegal. This resolution, however, may not have been the only basis for the formation of the district in question in the Second ward, hence in the present state of the record we would not be justified in holding that these votes were illegal because of the change of district made thereby. This being so, it is unnecessary for us to decide as to the legal right of creating an election district by resolution. Whether these 9 votes and the 13 heretofore referred to were cast in wrong precincts can only be decided when all the facts as to the establishing of the precincts for this election are before the court.

Appellant contends that Granville Hull was not entitled to vote on account of his mental incapacity. It appears that he was an old man,—just how old is not stated; that he had been residing with his children at different places in Illinois and came to Galesburg in the fall of 1906 to stay with his daughter, Mrs. Carlson; that on account of his physical and mental condition an arrangement was made with Robert S. Parker by which he was to live with and

be cared for by Parker for a consideration. Hull voted in the precinct in which Parker's residence was situated and was sworn in by Parker. His daughter, Mrs. Carlson, testified that he was just like a baby and that he had no mind at all; that he could not attend to the wants of nature. Her husband, E. H. Carlson, testified substantially the same. Hull had been at Parker's several weeks before the election, during which time his daughter had not seen him. The son-in-law saw him the day of election. Parker testified that Hull had lived with him for six months and that he swore him in as a legal voter, and that he thought he had a right to do so. One of the judges testified that Hull answered every question asked of him, and he (the judge) considered, from the way he answered them, that his mind was all right, though he was nearly blind, hard of hearing and very decrepit. F. O. McFarland was present at the polling place when Hull voted, and stated that Mr. Hull was in a very feeble physical condition but he did not see anything wrong with his mental condition.

There is in this State no express provision, either in the constitution or statutes, with reference to the question here under consideration. (*Clark* v. *Robinson,* 88 Ill. 498.) But we think it is fair to presume from this and other decisions that the vote of a person *non compos mentis* ought not to be received. "The vote of a man otherwise qualified, who is neither a lunatic nor an idiot but whose faculties are merely greatly enfeebled by old age, is not to be rejected. When a vote is attacked on the ground that the voter who cast it was *non compos mentis,* it is necessary to establish satisfactorily, by competent evidence, the alleged want of intelligence, and the test would probably be about the same as in cases where the validity of a will is attacked on the ground that the testator was not of sound mind when it was executed. If the voter knew enough to understand the nature of his act,—if he understood what he was doing,—that is probably sufficient." (McCrary on Elec-

tions,—4th ed.—sec. 115.) We think this is the generally accepted rule, supported by *Clark* v. *Robinson, supra,* and in accord with sound reasoning. (15 Cyc. 301; 10 'Am. & Eng. Ency. of Law,—2d ed.—p. 608.) It is well known that many persons who are failing mentally on account of old age are some days very much brighter than at other times. It might well be that while Hull was staying with Parker he was brighter and clearer, mentally, than while he was stopping with his daughter, Mrs. Carlson,—that he understood what he was about when he was voting. Three witnesses testified that he seemed to know what he was doing on the day he voted, and this evidence is uncontradicted. Between the day of election and the taking of the testimony Mr. Hull died. He was undoubtedly greatly enfeebled by age, but we do not think the evidence would justify the rejection of his vote.

So many of the alleged illegal votes involve the matter of residence that it will doubtless save time to discuss that question generally before we take up the individual cases.

Section 66 of the general Election law provides that "a permanent abode is necessary to constitute a residence." (Hurd's Stat. 1905, p. 867; *Johnson* v. *People,* 94 Ill. 505.) This question has been frequently discussed at length by this court and no definition can be made sufficiently comprehensive to apply to all cases that may arise. Tests satisfactory in some cases may not be so in others. No inflexible rules can be laid down that will govern in all these matters. (McCrary on Elections,—4th ed.—sec. 105.) Usually the decision must rest upon the facts and circumstances of the given case. The residence of the voter is a question "which often it is quite difficult to determine, and may be found either way without doing any marked violence to principle or the facts." (*City of Beardstown* v. *City of Virginia, supra,* p. 546.) What constitutes a residence in the abstract is a question of law, but whether it exists in a particular case is one of fact. (10 Am. & Eng.

Ency. of Law,—2d ed.—p. 598.) The words "domicile" and "residence" are frequently used interchangeably, as meaning the same thing. (McCrary on Elections,—4th ed.—sec. 97.) We held in *Dale* v. *Irwin*, 78 Ill. 170, that residence means nothing more than a domicile,—a home; but in *Dorsey* v. *Brigham*, 177 Ill. 250, we stated (p. 264) that while a domicile and residence may in some cases have the same meaning, frequently they have a different and inconsistent meaning and import entirely different ideas, and in that case it was held that while a person had a domicile in the county for the necessary length of time to vote she did not become a resident until she was physically present. To the same effect is *Chambers* v. *Prince*, 75 Fed. Rep. 176.

On the question of residence the intention of the voter is of great importance, and it has been said that residence is "mostly a question of intention" or "a question largely of intention." (*Chambers* v. *Prince, supra;* McCrary on Elections,—4th ed.—sec. 99.) Usually the declarations of the voter for the purpose of showing his intention are admissible though not necessarily conclusive. On the question of residence or domicile less weight is given to the party's declarations than to his acts. (*Kreitz* v. *Behrensmeyer*, 125 Ill. 141.) Three general rules on this subject are, however, reasonably well settled: (1) That a man must have a residence or domicile somewhere; (2) when once gained it remains until a new one is acquired; (3) a man can have but one domicile at a time. (10 Am. & Eng. Ency. of Law,—2d ed.—598.) In order to work the change of residence there must be, both in fact and intention, an abandonment of the former residence and a new domicile acquired by actual residence, coupled with the intention to make it a permanent home. (15 Cyc. 291.) The domicile having been once acquired it will be presumed to continue unless it affirmatively appears it has been changed. *Moffett* v. *Hill*, 131 Ill. 239.

What constitutes a "permanent abode" prescribed by the statute is a question not free from difficulty. It was

held in *Dale* v. *Irwin, supra,* that it meant nothing more than a domicile or a home, which the party might leave as interest or whim might dictate but without any present intention to change it. In *Kreitz* v. *Behrensmeyer, supra,* in discussing the rule laid down in *Dale* v. *Irwin,* we said (p. 193): "This was sufficiently accurate as applied to the facts in those cases, but there is an obvious inaccuracy in the latter part of the quotation when considered with reference to somé of the facts in the present record. * * * 'A man may acquire a domicile if he be personally present in a place and elect that as his home, even if he never design to remain there always but design at the end of some short time to remove and acquire another. A clergyman of the Methodist church, who is settled for two years, may surely make his home for two years with his flock, although he means at the end of that period to remove and gain another.' * * * 'Suppose a man, single, with no property, to come from Ireland and be employed all his life on railroads or other like works, at different places in succession. If he does not acquire a residence he can never become a citizen, because he never would reside in this country at all.' " And it was there held that a person without a family, or having his family with him, who intends to remain where he is or go elsewhere, as decided by his chances for obtaining work, but intends to make his home while his work lasts at that place, will have a residence there for voting purposes; but the intent to make that district his home for all purposes must be in good faith. This same rule will apply to a school teacher who resides where he can get employment, or to a laborer who works wherever he can find employment to furnish him a livelihood, and when his work in one place is finished goes to another. (McCrary on Elections,—4th ed.—sec. 105.) Our habits as a people, compared with most nations, are migratory. Often the choice of a residence is experimental and temporary. "The home is chosen with intent to retain it until

the opportunity shall offer of a better. But if it be chosen as a home, and not as a mere place of temporary sojourn, to which some other place which is more truly the seat of the affections or interests has superior claim, we see not why the policy of the law should not attach to it all the privileges which belong to residence, as it is quite clear that it is the residence in the common and popular acceptation of the term." (McCrary on Elections,—4th ed.— p. 561.) With these general observations we will now consider the particular cases.

Frank Dyke, a well-digger working for a Chicago company, came to Galesburg in July, 1906, to dig wells for the city and remained there at work until after the election in question. He testified that he intended to make Galesburg his home as long as the work kept him there. When he came he did not know how long he would continue to reside, but would continue as long as his work held out, and considered it his legal residence while there. Just prior to coming to Galesburg he had been digging wells in Milwaukee, Wisconsin, and had remained in that State for some five or six months. He testified that he had always considered Illinois his home and had never voted in any other State. He did state that while he was in Milwaukee that city was his home, but still it is apparent from his entire testimony that he considered Illinois his voting residence and expected to return to this State as soon as he finished the work in Wisconsin. The facts as to the residence of one Charles Smith in *Carter* v. *Putnam,* 141 Ill. 133, are very similar as to the loss of residence by moving to another State to those that we are now considering in the case of Dyke. In that case it was held that Smith did not lose his residence. (See, also, *Collier* v. *Anlicker,* 189 Ill. 34.) Where a person leaves his residence and goes to another place, even if it be another State, with only a conditional intention of acquiring a residence, he does not lose his former residence so long as his intention

· remains conditional. (*City of Beardstown* v. *City of Virginia, supra; Palmer* v. *Riddle,* 197 Ill. 45.) The reasoning in these cases, as well as in *Kreitz* v. *Behrensmeyer, supra,* and McCrary on Elections, as to the railroad laborer and the school teacher, we think decisive here. We are of the opinion that Dyke was a legal voter in Galesburg when he cast his ballot.

Martin Hackett is claimed to have voted in the wrong precinct. It appears that he was employed at a restaurant at 108 East Main street, in the First ward, occupying the upper part of the building with his wife as a residence; that he had rented a house in the Sixth ward on March 7, but intended to keep his residence at 108 East Main street until after election; that about the 10th or 12th of March he moved some things into the residence in the Sixth ward; that he had one bed there and kept one bed in his old residence at 108 East Main street; that while they were cleaning up the new place and getting ready to move in he and his wife slept at the residence in the Sixth ward, and while there he was taken sick and quarantined for small-pox and remained in that house until March 31, when he was released; that on the night before election he slept at 108 East Main street, in the First ward, where he voted on election day. His wife, however, slept at the other place, in the Sixth ward. In *Williams* v. *Whiting,* 11 Mass. 424, the question was as to when the plaintiff ceased to be a resident of one town and became a resident of another. On the 28th of October, 1811, being then a resident of Roxbury, he received an appointment which rendered it convenient, if not necessary, to reside in Dedham. He then commenced to prepare for his removal, and from that time until the 12th of November he passed almost every day in Dedham, where he transacted business, and returned to his family each night, except three, in which he slept in Dedham. He had also on the 29th of October engaged a house in Dedham but did not occupy it until the 12th of Novem-

ber, when he removed his family and became domiciled there. The court held that the voter remained an inhabitant of Roxbury until the day of his removal with his family. This case is quoted with approval by McCrary on Elections, (4th ed. par. 88,) and has also been referred to with approval by this court in *Behrensmeyer* v. *Kreitz, supra,* on page 636. An intention to change the domicile without actually removing with the intention of remaining does not cause a loss of domicile; (*State* v. *Hallett,* 8 Ala. 159;) and the mere intention to acquire a new domicile without any act of removal avails nothing. (*Smith* v. *Croom,* 7 Fla. 81.) In *State* v. *McGeary,* 38 Atl. Rep. (Vt.) 165, McGeary had been a resident of ward 4, occupying a suite of rooms with his wife, paying rent and both sleeping there until January 6. During the latter part of his stay he had purchased a lot in ward 6, erected a house thereon and fitted it with things necessary for a home, taken from his rooms in ward 4 and elsewhere. On January 6 he and his wife actually left the old rooms and took up their abode in the new house, where he was living March 2 when elected alderman from ward 6. The court decided that his residence must be reckoned from January 6, the time he actually moved into the new house. In *Pedigo* v. *Grimes,* 113 Ind. 148, it was stated that it could hardly be doubted that a man livng in Evansville was a resident of that city, although he may intend to remove to Indianapolis either at a fixed time or at an indefinite period in the future. The fact that Hackett's wife remained at the new place would not be decisive. The domicile of the husband usually fixes that of the wife. (*Dorsey* v. *Brigham, supra.*) It is clear from the evidence that Hackett intended in good faith to keep his voting residence in the First ward until after election. He was therefore entitled to vote.

The right of F. A. Seeley to vote is also contested. The evidence shows that he was a man of standing, having been in business in the city for years prior to the election;

that he had been living in the north district of the Fourth ward, but in February, 1907, rented a house in the south district of that ward, apparently paying rent from the time he signed the lease. There is testimony tending to show that while he moved in some of his furniture the last of February or in March, he did not begin to live or sleep there until less than thirty days before the election. He testified that he moved some of his furniture, including a bed, the last of February, and that he and his wife slept there several nights in that month; that he occupied the house the last two weeks of February; that he had fruit jars and some bedding over at the other house, but that he moved them to his new residence in March. One witness called by appellant testified that he was all through the new residence the last days of February and he saw no bed there. As we have stated, this question of residence is a difficult one. A man cannot have two residences at the same time. Where the circumstances are such that a man may claim a domicile at either one of two places, the place he regards as his domicile or home will be his residence for the purpose of voting. (*Behrensmeyer* v. *Kreitz, supra.*) The decision of this question is complicated by the fact that Mr. Seeley on election day attempted to vote in the district of his old residence, the north district of the Fourth ward, and when he was challenged there he went at once to the south district of the Fourth ward and was challenged and swore in his vote at that place. If it were not for this fact we should have little hesitation, on this record, in holding that he was entitled to vote in the south district of the Fourth ward. While the question is close, the fact that he attempted to vote in the wrong district is not necessarily decisive. While it may have some weight as to his intention, it is well known that the ordinary citizen frequently makes a mistake as to where the law will permit him to vote, and the fact that he made such a mistake would not, in itself, preclude him from voting in the right place. We

have held that where a man voted without right in another State he did not thereby lose his residence and right to vote in this State. (*O'Hair* v. *Wilson*, 124 Ill. 351; *Imhoff* v. *Lipe*, 162 id. 282; *Collier* v. *Anlicker, supra.*) We are inclined to think, on the facts shown, that Mr. Seeley was not entitled to vote in the district to which he had moved.

It is admitted that Theodore L. Haas, as shown by this record, was not entitled to vote. He swore that he voted for appellee for mayor. His evidence is contradicted on some points by other witnesses and we do not think is entirely worthy of credence, but considering all the facts we conclude that his vote, on this record, should not have been counted for the appellee.

Clyde Hainline voted, and there is some evidence tending to show that he voted for appellee. The evidence shows quite clearly that he had not resided in the State for one year, and his vote should therefore not be counted for the appellee.

John Bood, an old man, came from the county almshouse, a few days before election, to the city for the purpose of voting. A party does not forfeit his residence in a precinct in which he was a voter merely by becoming a county charge. (*Dale* v. *Irwin, supra.*) It is admitted that he had a right to vote, but it is contended that he voted in the wrong precinct. He had been a resident of the city for forty-five years or more. He left Mrs. Banks' boarding house, in the precinct in which he voted, about a month before he went to the almshouse, moved into another precinct and stopped at another boarding place, which latter place he left for the almshouse late in 1906. The evidence of Mrs. Marshall, another boarding house keeper, tends to show that he came back from the almshouse in January or February, 1907, and stayed at her place for several weeks. It is admitted in the record that Mrs. Marshall's boarding house is in the precinct where Bood voted.

On election day he went to the voting place in this precinct and swore in his vote when he was challenged, and stated in his affidavit that his residence was at Mrs. Banks' lodging house. When an elector is permitted to vote, the presumption is in favor of the legality of the vote, and the burden is on the attacking party to show lack of qualification or the forfeiture of the right. (15 Cyc. 416, and cases there cited.) The mere fact that Bood, apparently enfeebled by age, stated the wrong lodging house in the proper precinct is not sufficient to justify the rejection of his vote, and it was properly counted.

Henry Johnson's vote is also questioned on the ground that he voted in the wrong precinct. It appears that his house is located near the boundary line between two precincts. The appellant attempted to show that the precinct boundary was the north line of Grove street produced, but the record discloses that Grove street runs east and west and is interrupted, ending at Broad street, one block east of Johnson's residence, and commencing again at Maple avenue, three blocks west of his residence, and that the measurements taken by the engineer were at Maple avenue while no measurements were taken at Broad street. We do not think there is any legal evidence in the record establishing the boundary line as to these precincts with reference to Mr. Johnson's residence. Some of the testimony of the engineer tended to show that the line ran through the house, as we understand the record. If this be so it would be necessary to have the exact line, and even then it would be difficult to decide which precinct should be considered his residence. (See *Abington* v. *North Bridgewater,* 23 Pick. —40 Mass.—170.) On the record before us, the presumption being that Mr. Johnson was a legal voter, there is no evidence of a character to justify the rejection of his vote.

John Stukenburg voted, and it is admitted that he was an alien and therefore not entitled to vote. It is not absolutely clear from the record for whom he voted. The

judges went into the booth with him, as he could not read and write, and helped him mark his ballot. Their testimony could not be taken as to how he voted. (*Gill* v. *Shurtleff*, 183 Ill. 440.) This question could better be determined by the trial court than by the court of review, as could also the legality of several other votes that are questioned. In deciding the case it appears that the trial judge said he did not find it necessary to discuss the various votes; that, considering the evidence in the most favorable light for appellant, enough votes could not be rejected to give him the majority. From the reading of the record before us we are inclined to think that Stukenburg's vote should be taken from the number counted for appellee.

While John Buffington is admitted to be a legal voter in the city, it is claimed that he voted in the wrong precinct, having moved from Mrs. Banks' lodging house in March before election. There is some testimony tending to show that in March he moved, or partly moved, from Mrs. Banks' house to some property of his near a racetrack, but there is no evidence as to what precinct this property was situated in. He swore in his vote, and in his affidavit gave his residence as Mrs. Banks' lodging house. The record is not very clear as to whom he voted for. He was not called as a witness, and one Jordan, a police officer, testified that Buffington told him some ten days before the election that he would not vote for appellant. It is very frequently difficult to prove for whom a voter cast his ballot. If it is not shown that the vote was illegal he himself cannot be compelled to answer how he voted. Circumstantial evidence may be offered on this subject. (*Rexroth* v. *Schein*, 206 Ill. 80.) From an examination of the testimony we do not think it overcomes the presumption that the vote cast by Buffington was legal. *Hope* v. *Flentge*, 140 Mo. 390.

Appellant, in the statement of the case in his original brief, claims that there were some thirty votes for appellee

by students of Knox College who he alleged voted illegally, but in the body of the brief he only takes up and discusses specifically the right of eight students to vote. The rule of this court is, that unless counsel in the original brief point out specifically why the trial court's action is erroneous, it is no part of our duty to enter upon an independent investigation in order to furnish material upon which to base a judgment for reversal. (*Wickes* v. *Walden,* 228 Ill. 56, and cases cited.) It is only necessary, therefore, for us to consider the eight student votes which appellant in his original brief specifically points out as being illegal. It is true that in his reply brief he does claim that another student, Holmes, voted illegally and gives some of his reasons for such claim, but under rule 15 of this court any alleged point or error not contained in the original brief cannot be raised in the reply brief.

In *Dale* v. *Irwin, supra,* in discussing the right of undergraduate students to vote in this State, we stated that the undergraduates of a college who are free from parental control and regard the place where the college is situated as their home, having no other to which to return in case of sickness, are as much entitled to vote as any other resident of the town pursuing his usual avocation; that the college town is, *pro hac vice,* the home of such students,—their permanent abode in the sense of the statute,—but that as a general rule undergraduates of colleges are no more identified with the interests of the town in which they are pursuing their studies than the merest stranger. In McCrary on Elections, (4th ed. sec. 101,) that author states that it will be found that the question of whether a student at a college is a *bona fide* resident must in each case depend upon the facts. "Whether he is or not will depend upon the answer which may be given to a variety of questions, such as the following: Is he of age? Is he fully emancipated from his parents' control? Does he regard the place where the college is situated as his home, or has he a home elsewhere

where he expects to go and at which he expects to reside? In a word, it is necessary, from a survey of all the facts, to determine whether while at college he is at his home,— his residence,—or temporarily absent from it." Where a person of mature years leaves the home of his parents, relying upon his own efforts and means, with no fixed determination as to future residence, he is a legal voter, if otherwise qualified, wherever he may attend college. (McCrary on Elections,—4th ed.—p. 75, note 4.) In *Putnam* v. *Johnson,* 10 Mass. 487, the court held that a student attending a theological institution, being otherwise qualified, who was emancipated from his father's control, was entitled to vote in the college town, even though his father had loaned him money to assist him in his college course, both understanding that the money was to be repaid by the son. In Cooley's Constitutional Limitations (7th ed. p. 904,) the rule is laid down that a student in an institution of learning, as a resident there for the purpose of instruction, may have a residence at such place, provided he is emancipated from his father's family and for the time has no home elsewhere. The Supreme Court of Indiana in *Pedigo* v. *Grimes, supra,* held that a student who goes to a college town with the intention of remaining there simply as a student and does not change his intention does not acquire a residence, but where the intention is formed at any time to make the town his domicile in good faith, to the exclusion of all other places, he becomes a citizen and entitled to vote, if otherwise qualified, even though he intends to remain only a limited period. In *Hall* v. *Schoenecke,* 128 Mo. 661, it is stated that there is no doubt that a student might become a resident of the college town after he went there to attend school. Whether he has done so depends on the facts and circumstances. The fact that he is supported by his parents will be a strong, but not a conclusive, circumstance to prove that he has not changed his residence. The question is largely one of intention, al-

though as to this the testimony of the student himself will not necessarily be conclusive.

A student in a college town is presumed not to have the right to vote. If he attempts to vote, the burden is upon him to prove his residence at that place, and it must be done by other evidence than his mere presence in the town. (10 Am. & Eng. Ency. of Law,—2d ed.—p. 605.) The fact that a student has resided in a college town the necessary length of time does not, of itself, entitle him to vote there. If he supports himself entirely by his own efforts, is not subject to parental control, regards the place where the college is situated as his home, even though he may at some future time intend to remove, has the intention of making it his present abiding place, and has no positive and fixed intention as to where he will locate when he leaves, he is entitled to vote; and this may be true even though he borrows money from his parents to help him through college. This latter fact, however, will greatly weaken his claim to a residence in a college town, unless it be shown to be purely a business proposition between himself and his parents, very like what it would be if he borrowed from an entire stranger. A student might gain a residence in a college town if he was paying for his education out of the money that his parents had given him with such an understanding as was had in the case of one of the students here in question, where the father gave to each of his children, when they became of age, $1500, and told each to use the money as he saw fit,—either to start in business or to educate himself,—this student using his to attend college. The residence in such college town must be an actual, *bona fide* one, with no intention of returning to the parental home upon the completion of the studies. The controlling inquiry in deciding the residence of students, as with all others, is, where "does the party actually make his home and claim for the time to exercise the rights of property

or of citizenship incident to or resulting from permanent residence?" *Kreitz* v. *Behrensmeyer*, 125 Ill. 141.

Under these rules, on the evidence in this case we think that J. W. Hilding was undoubtedly entitled to vote, and we are inclined to think that Murray M. Baker and C. C. Stevenson could rightly claim their legal residence in Galesburg. We are also inclined to hold that E. F. Kitchen, Raymond Sapp, A. W. Orcutt, Theodore L. Holman and George Rathburn did not have a permanent abode in Galesburg, although as to some of these students the evidence is very close. Moreover, if we were finally deciding the case we should hesitate to say, as to one or two of these last named, whether there was sufficient evidence to justify us in holding that they cast their votes for appellee.

The views heretofore expressed must lead to a reversal of the case. Upon another trial the rules here stated will doubtless enable the trial court to dispose of all the material controverted questions.

The judgment is reversed and the cause remanded for further proceedings consistent with this opinion.

*Reversed and remanded.*